IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

In re:                                          )
                                                )
PAUL TRANSPORTATION, INC.,                      )   Case Number: 10-13022
Tax ID No. 71-0921816,                          )   (Chapter 11)
                                                )
            Debtor.                             )

## SUBMISSION OF AFFIDAVIT

Paul Transportation submits the attached Affidavit OF Troy Paul.

/s/ Matthew C. Goodin
Matthew C. Goodin, OBA #19327
Stephen W. Elliott, OBA #2685
G. David Bryant, OBA #01264
KLINE, KLINE, ELLIOTT & BRYANT, P.C.
720 N.E. 63rd Street
Oklahoma City, OK 73105
Telephone: (405) 848-4448
Facsimile: (405) 842-4539
Email: mgoodin@klinefirm.org
Email: selliott@klinefirm.org

ATTORNEYS FOR
THE DEBTOR IN POSSESSION,
PAUL TRANSPORTATION, INC.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| In re: | ) |
| | ) |
| PAUL TRANSPORTATION, INC., | ) Case Number: 10-13022 |
| Tax ID No. 71-0921816, | ) (Chapter 11) |
| | ) |
| Debtor. | ) |

### AFFIDAVIT OF TROY PAUL, PRESIDENT AND CHIEF EXECUTIVE OFFICER OF PAUL TRANSPORATION, INC., IN SUPPORT OF FIRST DAY MOTIONS

| | |
|---|---|
| County of Oklahoma | ) |
| | ) ss: |
| State of Oklahoma | ) |

I, Troy Paul, being first duly sworn, upon oath state as follows:

1. I am the president and chief executive officer of Paul Transportation, Inc. (the "Debtor").

2. I am authorized to make this affidavit on behalf of the Debtor.

3. In recent weeks, I have been involved in and have personal knowledge of the negotiations with RTS Financial Services, Inc., the Debtor's factor, about the Debtor's potential Chapter 11 filing and financial restructuring. I am familiar with the Debtor's existing credit facilities, operations, employees, banking procedures, financial status and projections, as well as the Debtor's need for the employment of professionals, bank accounts, retention of critical trade vendors, and continued utility service.

4. I submit this affidavit in support of the Debtor's First-Day Motions in the above-captioned chapter 11 case. Any capitalized terms used herein shall have the same meaning ascribed to such capitalized terms as set forth in the respective First-Day Motions. Except as otherwise indicated, all facts set forth herein are based upon personal knowledge, my

review of relevant documents, or my opinion based on my experience and knowledge of the Debtor, its operations and its financial condition. As an officer of the Debtor, I am authorized to submit this affidavit and, if called to testify, I would testify competently as to the facts set forth herein.

5. In April of 2010, the Debtor's Boards of Directors authorized the filing of this Chapter 11 bankruptcy case. On May 18th, 2010 (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

6. The Debtor continues in possession of its properties and to manage its business as a debtor and debtor-in-possession.

7. In order to enable the Debtor to operate effectively and minimize the adverse effects of its Chapter 11 filing, the Debtor has filed and requested certain "First-Day" relief in the form of applications and motions (the "First-Day Motions") filed with the Court on the Petition Date.

### A. General Background

8. The Debtor is a privately held Oklahoma corporation that was formed in 2002. It is headquartered in Enid, Oklahoma and has been in active operation since 2003.

9. The Debtor now operates 125 company trucks and uses an additional 51 owner/operators to provide flatbed transportation services across the lower 48 states. The Debtor hauls a variety of goods, including steel, wallboard, and lumber.

10. The Debtor's fleet consists of 2007 Model 379 Peterbilts, 2008 Model 389 Peterbilts and 2009 Model 386 Peterbilts, which use CAT or Cummins engines, and Reitnouer all-aluminum trailers with 50,000 lbs. plus capacity.

11.     Approximately 20% of the Debtor's fleet is now under long term dedicated contracts.

12.     The Debtor maintains service terminals in Sapulpa, Oklahoma, Oklahoma City, Oklahoma, Crosby, Texas and Fort Dodge, Iowa. The Debtor's Sapulpa location includes a drop yard to temporarily store freight being shipped in and out of the Tulsa area. The Debtor's primary maintenance facility and driver recruiter are located in Oklahoma City. The Debtor's newest location is in Crosby, Texas and consists of a pipe drop/storage yard, and an office location for local and over-the-road freight dispatching. The Debtor also has a rock hauling division located in Medicine Lodge, Kansas that sits on 5 acres, with a shop containing 4 bays, a covered fuel island and truck wash, and a drivers' lounge.

13.     In addition to employing over 175 drivers, the Debtor employs 25 people in non-driving positions.

14.     The Debtor's total debt is in excess of $23 Million, and is held by approximately 2800 parties in interest.

### B. Events Leading to the Filing of the Chapter 11 Petition

15.     The Debtor in this case is a trucking company that offers over-the-road transportation services using tractors and flatbed trailers. The Debtor typically engages in hauling pipe, steel, wallboard, coils, paper, lumber and other products used in the construction and oil and gas industry. Shortly after the Debtor's formation, construction and oil and gas industry activity spiked, which increased demand for the Debtor's services and incresed the Debtor's gross receipts up from approximately Three Million Dollars in 2004 to over Sixty One Million Dollars in 2008. As the demand for transportation services increased, the Debtor expanded its operations and increased its fleet of rolling stock, with a corresponding increase in

the Debtor's debt load. Beginning in late 2008, the economic recession began to negatively impact the construction industry, the oil and gas industry, the Debtor's customers, the Debtor, as well as the entire transportation industry. More particularly, as a result of the rapid and precipitious decline in construction and drilling, the demand for the Debtor's hauling services also quickly and preciptiously decreased. Although the Debtor has maintained its long term customers, customers now require less freight hauling. Another consequence of the decrease in demand for the hauling services generally was an over-supply of haulers and increased competition, which caused the industry-wide rate per mile to decrease from $2.09 per mile in October 2008 to $1.64 per mile in February 2009, which further reduced the Debtor's gross receipts. In response, to reduce its debt load and accompanying cash flow requirements, the Debtor began liquidating some of its fleet, but the circumstances described above also caused the sales prices for used tractors and trailers to plummet as well, leaving the Debtor with deficiencies to service. The bankruptcy filing of one of the Debtor's customers, which rendered over $300,000.00 of receivables not immediately collectible, added to the Debtor's financial pressures.

        C.     **Facts Supporting Debtor's Chapter 11 Filing and First-Day Motions**

16.    The Debtor has filed a number of First-Day Motions, which are listed in the Debtor's Application to Shorten Time and for Expedited Consideration of Certain "First Day" Motions. These First-Day Motions were provided to the Court with the filing of the Debtor's Petition. Approval of each of the Debtor's First-Day Motions is an important, and in some instances critical, element in the Debtor's successful reorganization. The factual background and rationale for each of the Debtor's First-Day Motions is provided below.

4

**Motion for Interim and Final Orders Under 11 U.S.C. §§ 105(A), 361, 363, and 364 and Bankruptcy Rules 2002, 4001, 6003, and 9014: (A) Authorizing Debtor to Factor, and Incur Post-Petition Secured Indebtedness; (B) Granting Security Interests and Super-Priority Claims; (C) Approving Use of Cash Collateral; and (D) Scheduling Final Hearing (the "Factoring Motion)**

17. I believe that to reorganize successfully, the Debtor must be able to continue to operate in the ordinary course of its business, retain its employees, and pay other ordinary course of business expenses on a timely basis. Even a brief interruption in the Debtor's access to funds may have a disastrous and damaging affect on the value of the estate.

18. The Debtor has negotiated a post-petition factoring agreement, the terms of which are set out in the Factoring Agreement and Interim Order attached to the Debtor's Motion to Authorize Factoring Agreement ("Factoring Motion").

19. Given the manner in which the Debtor's pre-petition finances were structured, the Debtor will have relatively *de minimus* cash on hand as of the Petition Date, all of which may be cash collateral. To continue to operate, and preserve the value of the estate, the Debtor must have access to cash, and to obtain that access, the Debtor, negotiated the Factoring Agreement, which will allow the Debtor to continue to operate and preserve the value of the estate, at least on an interim basis. Approval of the Factoring Motion is critical to the Debtor's survival and the preservation of the estate.

20. The Debtor is unable to obtain adequate unsecured credit allowable under 11 U.S.C. § 503 as an administrative expense or other financing under 11 U.S.C. § 364(c) or (d) on equal or more favorable terms than those set forth in the Factoring Motion and its exhibits within the time frame required by its needs to avoid immediate and irreparable harm to the estate and the Debtor's business. The Debtor is unable to obtain financing on a post-petition basis without the Debtor granting the super-priority claims and the liens provided therein.

5

## Motion to Pay Pre-Petition Claims of Critical Trade Vendors, Pre-Petition Wage and Other Claims of Employees (The "Employee and Critical Vendor Motion")

21.     The Debtor has identified Critical Trade Vendors as set out on Exhibit A to the Employee and Critical Vendor Motion that hold pre-petition claims against the Debtor. I am empowered to represent on behalf of Debtor that it requests authority to pay, in its discretion, pre-petition claims of the Critical Trade Vendors in accordance with the terms as set forth in the Motion seeking that relief. At my direction, the Debtor has carefully scrutinized the Debtor's available trade suppliers and the Debtor has determined that those set out on Exhibit A to the Critical Vendor Motion are essential to the continued operation of Debtor's business, based on the goods and services supplied and the availability of other sources of supply of similar cost and quality. The Debtor estimates that the maximum amount of pre-petition trade claims the Debtor would be authorized to pay under its Critical Vendors Motion is approximately $478,031.38, which represents a relatively small portion of the Debtor's estimated total liabilities as of the Petition Date. The relief requested in the Critical Vendor Motion, if granted, will enable the Debtor to continue to receive, on ordinary trade credit terms, the essential goods and services that are the lifeblood of its business, and permit the Debtor to preserve the going concern value of its business. It is my belief that failure to grant the relief sought in the Critical Vendor Motion would severely impede the Debtor's ability to effectuate a successful reorganization.

22.     The Debtor employs a number of people essential to the Debtor's reorganization effort, particularly during its infancy. The retention and maintenance of the Debtor's employees during that period is particularly vital and necessary for the continuation of Debtor's business. For that reason, the Debtor has requested that it be authorized to pay in its discretion and in the ordinary course of business the pre-petition claims of the Debtor's employees for wages and

salaries, severance and sick pay, vacation pay, out-of pocket expenses, contributions to employee benefit plans, and all related taxes, including federal, state and local payroll taxes, deductions, and withholdings relating to the foregoing. On a monthly basis, the Debtor's employee-related claims total approximately $105,714.29, without related taxes and without accrued vacation pay. The amount owed by the Debtor at any particular time depends on the days elapsed in the pay cycle and when benefits are payable

23.     The failure to pay the employee-related claims the Debtor has sought authority through the Employee and Critical Vendor Motion to pay could result in hardship to employees.

24.     Payment of the employee-related claims and Critical Vendor claims is essential to maintaining morale and loyalty and also to maintaining the value of the estate. Delay in determining the relief requested in the Employee and Critical Vendor Motion could disrupt the Debtor's operations and be detrimental to Debtor's efforts to reorganize.

### Motion for Continued Use of Certain Pre-Petition Bank Accounts and Payment of Monthly Bank Charges (the "Banking Motion")

25     I understand that the United States Trustee has established operating guidelines for debtors-in-possession. These guidelines include, among other requirements, that a chapter 11 debtor: (a) close all existing bank accounts and open new debtor-in-possession bank accounts; (b) establish one debtor-in-possession account for all estate monies required for the payment of taxes including payroll taxes; (c) maintain a separate debtor-in-possession account for cash collateral; and (d) obtain checks for all debtor-in-possession accounts bearing the designation "debtor-in-possession," the bankruptcy case number, and the type of accounts. I believe that because of the nature of the Debtor's business, and the cost and disruption resulting from compliance with the guidelines, it is necessary that the Debtor obtain relief from these operating guidelines.

26.     The Debtor also seeks authority to pay any accrued and unpaid pre-petition bank charges on its Pre-Petition Bank Accounts. Accrued and unpaid pre-petition bank charges, if any, are negligible, but if these charges are not paid in the ordinary course of business, the bank may have the right of offset against the Debtor's accounts and can freeze the accounts until the bank can obtain relief from the automatic stay to offset. The right of offset and the right to freeze the accounts will disrupt the flow of funds that the Debtor depends on to fund its operations. I believe it is in the best interests of the estate and Debtor's creditors that these charges, if any are payable, be paid in the ordinary course of business.

### Motion for Entry of Interim and Final Orders 11 U.S.C. § 366: (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service; (B) Deeming Utilities Adequately Assured of Future Performance; and (C) Establishing Procedures for Determining Adequate Assurance Of Payment (the "Utility Motion")

27.     The Debtor uses electricity, natural gas, water, telephone services and/or other similar services from utility companies (the "Utility Companies") in the operation of its business and management of its properties. The services provided by the Utility Companies are undisputedly necessary to the operation of the Debtor's business. Any interruption in utility services would adversely impact the value of the estate by, at a minimum, interrupting at least in part the Debtor's revenue stream.

28.     The Debtor believes that its post-petition utility service will be approximately $12,465.66 per month. I believe the Debtor has a positive payment history with the Utility Companies. In addition, certain of the Utility Companies hold deposits, as set forth in more detail in the Debtor's Motion to Pay Employees and Critical Vendors and the Debtor's Motion to Prohibit Utilities from Discontinuing ("Utilities Motion"). Finally, assuming the Court approves the Debtor's Factoring Motion, the Debtor will have adequate cash available to assure payment to

all utilities for post-petition services on a timely basis. Therefore, I believe that the Utility Companies are adequately assured of payment.

29. Nevertheless, the Debtor has proposed a procedure in the Utilities Motion under which the Utility Companies would be precluded from unilaterally terminating service. Under the procedure proposed, the Debtor has requested within ten (10) days after the date of entry of this Order, the DIP shall furnish the Utility Providers adequate assurance of payment for post-petition date services by making a deposit equal to 100% of the Debtor's estimated cost of its post-petition monthly utility consumption (a "Utility Deposit") to each Utility Provider who does not already hold such a deposit, for the purpose of providing such Utility Provider with adequate assurance of payment of its post-petition date services to the Debtor. Except in accordance with the procedures set out in the Utilities Motion and the Interim Order thereon, which are summarized below, each Utility Provider would be prohibited from: (a) altering, refusing, or discontinuing service to, or discriminating against the Debtor solely on the basis of the commencement of this case or on account of any unpaid invoice for services provided before the petition date in this case: and (b) requiring the payment of any additional deposit or other security in connection with the Utility Providers' continued provision of utility services, including the furnishing of water and sanitation, telephone, gas, electricity and mobile phone services, or any other utility service to the Debtor.

30 If a Utility Provider is not satisfied with the assurance of future payment provided by the Debtor pursuant to the proposed Utility Deposit, the Utility Provider must serve a written request upon the Debtor setting forth the location(s) for which Utility Services are provided, the account number(s) for such location(s), the outstanding balance for each account, a summary of

9

the Debtor's historical amounts incurred over the course of the last 12 months for each account, and an explanation why the Utility Deposit is inadequate assurance of payment.

31. The Debtor hopes to file and to achieve confirmation of a Plan at the earliest possible time. In the interim, the Debtor hopes to minimize any adverse effect that the Chapter 11 filing might otherwise cause to the business of the Debtor through the motions and applications described above. This, in turn, would minimize the adverse effect upon creditors and other parties in interest. For all of these reasons, I respectfully request that the Court grant the requested relief contained in each First-Day Motion filed concurrently herewith.

FURTHER AFFIANT SAYETH NOT IN THIS AFFIDAVIT.

_____
Troy Paul

Subscribed and sworn to before me this 17 day of ___May___, 2010, by Troy Paul, president and chief executive officer of Paul Transportation, Inc.

(Seal)

Title: Notary Public

My commission expires: 2/18/12
#04001543

11