IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| IN RE: | ) | |
|     PAUL TRANSPORTATION, INC., | ) | Case No. 10-13022-NLJ |
| | ) | |
|     Debtor. | ) | Ch. 11 |
| | ) | |
| | ) | |

**OBJECTION BY UNSECURED CREDITORS' COMMITTEE TO
APPROVAL OF DEBTOR'S DISCLOSURE STATEMENT**

The Official Committee of Unsecured Creditors (the "Committee" or "Unsecured Creditors") hereby files this Objection ("Objection") to the approval of the Disclosure Statement of Debtor Paul Transportation, Inc. ("Debtor" or "PTI") dated December 15, 2010 [D-kt #249] (the "Disclosure Statement"). In support of this Objection, the Committee states as follows:

1. Debtor filed a voluntary Chapter 11 bankruptcy petition on May 18, 2010. On December 15, 2010, Debtor filed its proposed Disclosure Statement and Plan of Reorganization.

2. The purpose of a Disclosure Statement is to provide adequate information to creditors so that they are able to make an informed decision regarding the Debtor's plan.

3. 11 U.S.C. § 1125 provides that before a plan proponent may solicit votes on a plan, it must provide holders of claims or interests a disclosure statement approved by the Court as containing adequate information to enable a "hypothetical investor of the relevant class to make an informed judgment about the plan..." 11 U.S.C. § 1125(a)(1).

4. Specifically, adequate information is defined under 11 U.S.C. § 1125(a) as :

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interest in the case, **that would enable such a**

> **hypothetical investor of the relevant class to make an informed judgment about the plan**, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, **the benefit of additional information to creditors and other parties in interest,** and the cost of providing additional information. (emphasis added).

5.     In determining what constitutes adequate information, the information required is governed by the circumstances of the case. *Cajun Elec. Power Coop., Inc. v. Sw. Elec. Power Co.*, 150 F.3d 503, 518 (5th Cir. 1998)(citations omitted). A disclosure statement should contain "all those factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan." *In re Beltrami Enters, Inc.*, 191 B.R. 303, 304 (Bankr. M.D. Pa. 1995)(quoting *In re Stanley Hotel, Inc.*, 13 B.R. 926, 929 (Bankr. D. Colo. 1981)).

6.     The harm in failing to provide adequate information is readily apparent. Without adequate information, no creditor could assess, among other things, whether the plan ultimately to be proposed is offered in good faith, whether the plan as proposed is feasible, and whether the proposed plan distributions amount to fair and equitable treatment.

7.     In this case, the Disclosure Statement fails to provide adequate information that would allow the Committee to make an informed judgment about the Debtor's proposed Plan. Generally, the Committee objects to the Disclosure Statement because it fails to provide adequate information regarding (a) the effects that failure to restructure Debtor's rolling stock leases will have upon the Debtor's finances going forward; (b) Debtor's ability to service their lease debt going forward, and service various balloon payments due under those leases post confirmation; (c) the bifurcation of secured claims pursuant to 11 U.S.C. § 506 and the effect it will have on the number and amount of

claims in the unsecured class; (d) the precise number of unsecured claimants and amount of debt claimed, (e) Debtor's litigation matters; (f) the number of rolling stock which is still under warranty, and when those warranties will expire; (g) the effect that expiring warranties will have on an aging rolling stock fleet and what financial allowances have been made for higher repair expenses; (h) potential preference claims; (i) the disposition of net income over and above identified expenses during the 10 year term of the plan; (j) treatment of secured debt in terms of amount and time; and (k) Debtor's projected income and expenses for November 2010 through December 2016. These issues have bearing on whether the Committee should vote in favor or against the Plan and must be addressed in the context of the Disclosure Statement.

An extended discussion of these and other issues follows:

**A.      Debtor's Disclosure Statement Lacks Sufficient Information Regarding Debtor's Leases.**

8.      In this case, Debtor has structured the majority of its financial transactions as leases. As represented in Debtor's Disclosure Statement, the "leased" assets consist of 83 tractors, 100 trailers and other various pieces of equipment. *See* Disclosure at 20. Filed proof of claims with respect to the "leased" assets total approximately 9.7 million. *Id.*

9.      Debtor's Disclosure Statement fails to provide sufficient information as to Debtor's rolling stock/equipment leases in multiple respects. First, the Disclosure Statement represents that Debtor has taken "informal steps" in a "number of instances" to address "some of the issues" which have been created by the Debtor's equipment leases. *Id.* at 21. Accordingly, Debtor states that it has reached "some agreements" regarding structured satisfaction of cure amounts, as reflected on Exhibit A of the Plan. *See* Disclosure Statement at 21.

10. Debtor's ambiguous statements leave an abundance of questions: What informal steps has PTI taken? Which creditors has PTI contacted? What has been the results of these negotiations? Are these negotiations still ongoing? If so, what is the likelihood of success? The possibilities are endless and subject to sheer speculation and conjecture.

11. As a whole, the above-stated questions lead to the most glaring deficiency: How exactly will any resulting lease modification affect Debtor's ability to pay its creditors on an ongoing basis? Or perhaps as importantly, what is the effect on finances if no agreement is reached and the Debtor is not successful in negotiating a restructure of the leases? Some of these leases mature in less than a year. They also require significant balloon payments. These potential costs have not been fully disclosed nor has there been discussion/disclosure of how these post-confirmation debts will be paid. Also troubling, is the Disclosure Statement's failure to address whether any monetary savings (assuming that present financial projections contemplate no change in lease payments and still reflect plan feasability) resulting from a lease modification will be: 1) made available for debt services to the unsecured creditors and/or to increase the distribution to unsecured creditors; or 2) whether the money will be simply be allocated to the principals of PTI. Until these issues are resolved, it is impossible for the Committee to make an informed decision regarding Debtor's proposed plan.

12. Additionally, the Disclosure Statement asserts that PTI (or New Paul, should Class 22 reject the Plan) reserves the right to make future determinations regarding whether a transaction is a "true lease" or a secured financing transaction. *See* Disclosure Statement at 21. According to PTI's Disclosure Statement, "if a transaction is determined to be a secured financing transaction, the Claimant shall receive the same treatment as proposed for Class 3." *Id.* However, if the challenged

transaction is determined to be a "true lease," the Claimant shall receive the treatment provided for in the Plan for an assumed expired lease. *Id.*

13.     In this respect, Debtor's Disclosure Statement lacks clarity regarding essential information necessary for a creditor to determine whether it should vote in favor or against the Plan. Specifically, Debtor must clarify: 1) which leases will be subject to this evaluation; 2) the likelihood of success or failure from bringing such a challenge; and most importantly; 3) if the challenge is successful, what is the effect on Debtor's financial projections and debt service and will any resulting surplus/savings be applied to debt services or will it be allocated to current equity holders of PTI.

14.     By omitting this critical information, Debtor's Disclosure Statement once again fails to provide the Committee with adequate information necessary to make an informed decision regarding Debtor's proposed plan.

15.     Debtor's Disclosure Statement also lacks information regarding whether the leases it intends to assume are what is commonly referred to in the industry as "trac" leases. A "trac" lease–which derives its name from its terminal (or termination) rental adjustment clause, is a special type of lease generally used for "over-the-road" vehicles such as trucks, tractors, and trailers. Generally, a lease that contains a terminal rental adjustment clause will grant the lessor a fixed purchase option for the vehicle at the lease end. Often, the lessee is required to pay any deficiency if it chooses not to purchase the vehicle at the lease end and if the sales price is less than the fixed purchase option.

16.     It is imperative that Debtor's Disclosure Statement provide information regarding whether its leases contain 1) terminal rental adjustment clauses and if so, 2) the date the payment is required; 3) the amount of any required payment; and 4) the effect such payment will have upon

Debtor's financial projections and what additional debt service would be required. This information is critical. If such a "trac" payment exists, Debtor may be faced with the difficult choice of either making a weighty payment or losing its equipment. If it must let equipment go, does the Debtor have alternative plans to replace that equipment? Can the Debtor avoid the "trac" payments post-confirmation, or will they be an obligation of the Debtor to pay regardless? A meaningful analysis regarding how "trac" payments affect feasibility of the plan must be provided in the Disclosure Statement.

17. Finally, Debtor's Disclosure Statement fails to include critical information regarding the leased and purchased rolling stock/equipment such as 1) a description of the equipment; 2) whether all or part of the equipment is under warranty; 3) whether the lease payments cover maintenance costs and if not, what the estimated maintenance costs will be, going forward, for both leased and owned equipment; and 4) the age of the equipment.

18. It is also important to disclose the terms of any fixed hauling contracts the Debtor is currently under, and specifically, whether the terms of any such hauling contracts allows for a fuel surcharge. Fuel costs have risen recently and are projected to rise. Absent the ability of the Debtor to adjust their contract to compensate for the costs of rising fuel, it would be logical that the Debtor's financial projections would be questionable. Further, this would be a material fact which could negatively effect Debtor's financial projections, and if so, how and to what extent should be discussed.

**B.    Debtor's Disclosure Statement Lacks Adequate Information Regarding Claims Against the Estate**.

19. Additionally, the Disclosure Statement does not provide adequate information

regarding the claims against the estate. *See* Disclosure at 29-35.

20.     Debtor's Disclosure Statement lists two alternative sets of claims: 1) the claims as reflected by the schedules and timely filed proofs of claims; and 2) Debtor's own estimate of its actual liabilities. *Id*. at 29-32. Debtor's Disclosure Statement asserts that two calculations are necessary because the Schedules and filed proofs of claim do not accurately reflect the actual amount, type, and priority of claims enforceable against the Estate. *See* Disclosure Statement at 29. Debtor cites "post-petition payments made by Debtor, priority proofs of claims including amounts not entitled to priority, and disputes about amounts owed" as reasons for the discrepancy between the two figures. *See* Disclosure Statement at 32.

21.     The discrepancy between the two sets of figures is drastic: Whereas the first estimate states the amount of unsecured claims as over 15 million dollars, Debtor's estimate of its actual unsecured claims is approximately 4.5 million dollars. In a nutshell, Debtor has optimistically assumed that, at the end of the day, approximately 11 million dollars will be allocated in its favor.

22.     Practically speaking, there is a significant chance that some or all of the claims will be allowed, either in whole or in part. Debtor's Disclosure Statement makes some acknowledgment of this, and admits that "the estimated liabilities... may not accurately reflect the Estate's liabilities, particularly if the anticipated objections and motions are not resolved as [PTI] expects them to be." *See* Disclosure Statement at 35 (emphasis added). Despite this recognition, Debtor offers no analysis as to the feasibility of the plan if its anticipated objections and motions are not resolved in its favor.

23.     Though it is acknowledged that some estimate has to be made, since the Debtor has not taken advantage of the time to date to object to claims, the Debtor must make a better effort to estimate the actual claims, since the size of the unsecured debt pool is critical to confirmation. The

Debtor has not included probable unsecured debt arising from valuation of collateral under Section 506 of the Code. From the present information in the Disclosure Statement, it appears that Section 506 application alone could add over 1 million dollars of unsecured debt to the class.

Considering the magnitude of the amount at issue, it is unrealistic to expect the Committee to be able to make an informed decision regarding Debtor's Plan. PTI must disclose how the allowance of these claims will affect the feasibility of its plan and with respect to voting.

C.   **Debtor's Disclosure Statement Lacks Any Analysis Under 11 U.S.C. § 506.**

24.   Additionally, Debtor fails to include any meaningful analysis regarding whether the secured claims listed in its Disclosure Statement should be bifurcated into secured and unsecured claims pursuant to 11 U.S.C. § 506. Instead, Debtor assumes a value of the assets primarily for the purposes of determining the extent of the secured claims without any discussion of bifurcation.

25.   In doing so, Debtor ignores the fact that, as demonstrated in the Disclosure Statement's schedule entitled "Assets and Their Value", bifurcation could cause over 1 million additional dollars to be poured into the unsecured creditor pool. *See* Disclosure Statement at 17-20 (listing secured claims and the corresponding forced liquidation value). The Debtor has made a proposal regarding a partial payment to unsecured creditors over 10 years. The feasability of this proposal is difficult to determine when the amount to be paid under that proposal would have a swing of several hundred thousand dollars. PTI must disclose to the Committee how the bifurcation of claims would affect feasibility of its plan and depending upon the projected size of the unsecured class.

**D.    The Disclosure Statement Fails to Properly Identify the Number of Unsecured Claimants and the Amount of the Debt Claimed by the Unsecured Claimants.**

26.    Debtor also states that "there are approximately 200 claimants holding unsecured claims of $10,000 or less," with claims aggregating $180,898.49. *See* Disclosure Statement at 34. According to Debtor, "the remaining unsecured claims are held by about 40 claimants." *Id.* This estimate is insufficient. Disclosure must be given as to the precise number and amount of otherwise unsecured claims. For the purposes of voting, creditors are entitled to know exactly how many claimants there are and how many it will take to carry a class.

**E.    The Disclosure Statement Lacks Adequate Information Regarding Debtor's Litigation Matters.**

27.    One of the lawsuits listed in Debtor's Disclosure Statement is Case No.10C0392-005, *Daryl Thomason Trucking, Inc., et. al., v. Caterpillar, Inc., et al*, a products liability suit in which Debtor seeks to recover approximately $250,000 worth of damages sustained from forty-five defective C15 Caterpillar engines purchased from another vendor.

28.    In regard to the *Thomason* litigation, Debtor's Disclosure Statement fails to disclose 1) its likelihood of success; and 2) whether the amount of potential recovery is included as future income to be distributed to present ownership or for the benefit of unsecured creditors. A full explanation should be provided to allow the unsecured creditors to make an informed decision regarding Debtor's proposed plan including a use of these funds, if the litigation is successful.

29.    On Page 40 of the "Litigation" portion of Debtor's Disclosure Statement, Debtor notes that "the estate may also hold causes of action against various persons and entities." Debtor asserts that "a detailed evaluation of the merits of these potential causes of action or estimate of their monetary worth has not been made." *Id*. According to Debtor's Disclosure Statement, all such

causes of action, "whether arising Pre-Petition or Post-Petition and whether arising under state or federal law, are specifically preserved under the Plan and may be pursued after its Effective Date." *Id.*

30. Debtor's Disclosure Statement fails to sufficiently detail the nature of these potential causes of action, the amount(s) in dispute, and the likelihood of success. More importantly, Debtor's Disclosure Statement is silent as to where any recovery from such potential causes of action would be allocated under the plan–i.e., to the Debtor (to equity holders) or for debt-services. Historically, these type of actions are preserved for the benefit of unsecured creditors, though it is not clear here who would benefit from those claims. Full disclosure must be made for creditors to assess whether any such claims exist, the potential value of such claims, and if so, who will benefit financially from any such claims.

F. **Debtor's Disclosure Statement Fails to Demonstrate How Changes in PTI's Operations Have Benefitted The Estate.**

31. A significant portion of Debtor's Disclosure Statement is devoted to changes made to PTI's operations either shortly before or since the filing bankruptcy on May 18, 2010. This includes:

    a. A reduction to the size of Debtor's fleet (*See* Disclosure Statement at 7);

    b. A decrease in employee salaries (*See* Disclosure Statement at 7) and number of employees (*See* Disclosure Statement at 5, 6);

    c. Allowing non-essential property to be recovered by creditors (*See* Disclosure Statement at 7);

    d. Entering into a lease with Paul Logistics, Inc. (*See* Disclosure Statement at 7); and

  e.  Expanding its Houston facility due to an increase in demand (*See* Disclosure Statement at 13).

By detailing these changes, Debtor appears to be assuring creditors that the problems that existed prior to filing bankruptcy have been resolved, and thus, Debtor's plan to reorganize is feasible. However, simply changing its operations does not necessarily equate to an increase in net income. Instead, Debtor's Disclosure Statement must articulate precisely what <u>value</u> these changes brought to Debtor's corporation so that the secured creditors can make an informed decision regarding the feasibility of Debtor's Plan.

**G. Debtor's Disclosure Statement Lacks Adequate Information Regarding Preference Claims.**

  32. It appears from Debtor's analysis of potential preference claim that it is Debtor's intention to waive any type of preference or fraudulent transfer claims it may possess and assign any preference claim to the unsecured creditors. *See* Disclosure Statement at 22-29. This seems slightly inconsistent. It is not clear if Debtor wants to waive some of its preference claims, all or none. If such is Debtor's intent, it must be made clear. The Unsecured Creditors Committee cannot be left to guess as to whether it is entitled to recovery from any preference litigation. Debtor's Disclosure Statement must clarify this confusion.

  33. It does appear that the Debtor wants to discourage or preclude litigation against some of its ongoing vendors. If this is the Debtor's proposal, then full disclosure must be given including: (a) the identity of each specific creditor the Debtor wants to exclude from any future preference or avoidance claims; (b) the amount of potential claim that may exist against such proposed excluded creditor; and c) the factual basis the Debtor claims justifies the exclusion of such proposed excluded

creditor. Specifically, Debtor's Disclosure must disclose whether the Committee or Debtor or any future entity can bring a preference claim against any of the vendors or whether its claims are limited to vendors that are not critical to Debtor's future operations. If there are some vendors which PTI wishes to protect due to an existing working relationship, Debtor must disclose: 1) which vendor; 2) what amount; and 3) why this vendor should be excluded.

**H.     Debtor's Disclosure Statement Lacks Information Detailing the Use of Debtor's Income Over and Above Identified Expenses.**

34.     Pages 43-44 contain a brief description of Debtor's proposed plan.

35.     The Plan, as described in Debtor's Disclosure, divides the secured creditors into two separate classes– Class 21 and Class 22. Class 21 includes unsecured claims equal to, less than, or voluntarily reduced by the Claimant to $10,000. Class 22 includes all unsecured claims of more than $10,000 and those that are not voluntarily reduced to $10,000. *See* Disclosure Statement at 43.

36.     PTI's preferred Plan proposes two alterative scenarios dependant upon whether Class 22 accepts or rejects the Plan.

37.     However, both scenarios in Debtor's Disclosure fail to address what will occur to income over and above identified expenses on a going forward basis. Suppose, hypothetically, after all wages, salaries, debt-service and expenses are paid, Debtor makes an extra $500,000.00 for the year. Who is entitled to this money– the unsecured creditors? Principals of the Debtor? Debtor's Disclosure is silent in this regard. It is also not clear what could happen to the compensation of Troy Paul for the term of the plan after year 2. The Unsecured Creditors Committee should not be left to guess as to who it is entitled to this excess income. Debtor's Disclosure Statement must be clarified.

I.  **Debtor's Disclosure Statement Lacks Necessary Information Regarding Projected Future Income.**

38. Exhibit 2 of Debtor's Disclosure Statement contains information regarding Debtor's projected income and expenses for November 2010 through December 2016. According to Exhibit 2, PTI anticipates its cash flow to rise to approximately the 400k-500k dollar range.

39. Despite this assertion, Debtor's Disclosure lacks explanation or discussion as to how Exhibit 2 was created, making it difficult to assess the validity of Debtor's projections. By way of example, Exhibit 2 contains a category entitled "other income & expenses," which is expected to bring in revenue of $350,682.66 in the year 2011. The Unsecured Creditors Committee cannot reasonably be expected to guess what "other income & expenses" may refer to and the origins of such income. This information should be clarified to allow the Committee to formulate an opinion regarding the feasibility of Debtor's ability to perform under the plan.

## Relief Requested

The Disclosure Statement should not be approved before PTI provides clarity to the above-stated issues. The Committee respectfully asks this Court deny approval of Debtor's Disclosure Statement until Debtor provides sufficient information to address the Committee's concerns.

Dated: January 14, 2011

Respectfully submitted,

*s/Lyle R. Nelson*
Lyle R. Nelson, OBA#10914
Eric L. Huddleston, OBA# 21225
Karolina Roberts, OBA# 22288
Elias, Books, Brown & Nelson, P.C.
Two Leadership Square, Ste. 1300
211 N. Robinson
Oklahoma City, OK 73102
(405) 232-4021 Phone/ (405) 232-3746 Fax
lyle@lylenelsonlaw.com
COUNSEL FOR THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 14th day of January, 2011, a true and correct copy of the Objection to Approval of Debtor's Disclosure Statement was electronically served upon the following using the Court's CM/ECF system:

U.S. Trustee
Attorney Kevin Blaney
Attorney Brian J. Boerner
Attorney G. David Bryant
Attorney Stephen W. Elliot
Attorney Matthew Clay Goodin
Attorney David W. Hammond
Attorney William H. Hoch
Attorney Nkem A. House
Attorney Eric L. Huddleston
Attorney Crystal A. Johnson
Attorney Carlos D. Mayes
Attorney John W. Mee
Attorney Kiran A. Phansalkar
Attorney Loretta K. Roberts
Attorney Karolina Roberts
Attorney Andrew R. Turner
Attorney Edward M. Zachary

Further, I certify that on the 14th day of January, 2011, a true and correct copy of the Objection to Approval of Debtor's Disclosure Statement was forwarded via U.S. Mail, first class postage prepaid and properly addressed, to the following at the addresses shown below:

Office of the U.S. Trustee (via ECF only)
215 Dean A. McGee Avenue
4th Floor
Oklahoma City, OK 73102

                                      *s/Lyle R. Nelson*
                                      Lyle R. Nelson