## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

In re: )
)
PAUL TRANSPORTATION, INC., ) Case No. 10-13022-NLJ
Tax ID No. 71-092181 ) (Chapter 11)
)
　　　　　Debtor. )

---

## PAUL TRANSPORTATION, INC.'s
## FIRST AMENDED DISCLOSURE STATEMENT

---

Stephen W. Elliott, OBA #2685
Matthew C. Goodin, OBA #19327
KLINE, KLINE, ELLIOTT & BRYANT. P.C.
720 N.E. 63rd Street
Oklahoma City, OK　73105
Telephone: (405) 848-4448
Telefacsimile: (405) 842-4539
selliott@klinefirm.org

ATTORNEYS FOR PAUL TRANSPORTATION, INC.

February 14, 2011

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................1

THE DEBTOR..............................................................................................................4

EVENTS LEADING TO BANKRUPTCY .........................................................................5

THE CONDITION AND PERFORMANCE OF THE DEBTOR IN POSSESSION.........9

ASSETS AND LIABILITIES ........................................................................................17

    A.    Available Assets and Their Value...............................................18
    B.    Claims Against the Estate .........................................................33

BALANCE SHEET, INCOME STATEMENT, AND *PRO FORMA* PROJECTIONS ...39

MANAGEMENT..........................................................................................................40

THE RELATIONSHIP OF THE DEBTOR WITH AFFILIATES ...................................42

LITIGATION ..............................................................................................................42

TAX CONSEQUENCES OF THE PLAN ......................................................................44

    A.    Tax Consequences to the Estate................................................45
    B.    Tax Consequences to Claimants ...............................................46

LIQUIDATION ...........................................................................................................46

RISK FACTORS ..........................................................................................................49

Exhibit 1:    Balance Sheet and Income Statement
Exhibit 2:    Projected Income and Expenses for November 2010 through December 2016
Exhibit 3:    Payments required under the Plan
Exhibit 4:    Troy Paul's resume
Exhibit 5:    Ryan Dobbs' resume

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

In re:                                          )
                                                )
PAUL TRANSPORTATION, INC.,                      )        Case No. 10-13022-NLJ
Tax ID No. 71-092181                            )        (Chapter 11)
                                                )
                Debtor.                         )

## PAUL TRANSPORTATION, INC.'S FIRST AMENDED DISCLOSURE STATEMENT

Paul Transportation, Inc. (the "Debtor in Possession") submits this disclosure statement

pursuant to 11 U.S.C. § 1125.

> **BANKRUPTCY COURT APPROVAL OF THIS DISCLOSURE
> STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT OF THE
> PLAN OF REORGANIZATION OR A GUARANTEE OF THE
> ACCURACY OR COMPLETENESS OF THE INFORMATION IN THIS
> DISCLOSURE STATEMENT.**

Capitalized terms in this disclosure statement are defined either in the Debtor in

Possession's plan of reorganization (the "Plan"), a copy of which was served upon you with this

disclosure statement, or in the Bankruptcy Code, 11 U.S.C. § 101 *et seq*. (the "Code").   Defined

terms have the same meanings in this disclosure statement that they do in the Plan and Code.

### INTRODUCTION

Voting on a plan of reorganization is important.   To be confirmed under Code § 1129(a),

each impaired class of Claims and interests must accept a plan.   An impaired class of Claims

accepts a plan if a majority in number and at least two-thirds in dollar amount of the allowed

Claims voted in that class vote to accept.   An impaired class of interests accepts a plan if at least

two-thirds in amount of the allowed interests voted in that class vote to accept.

1

A number of additional requirements must also be satisfied before a bankruptcy court will confirm a plan under Code § 1129(a).   For example, Code § 1129(a) requires that each holder of a Claim or interest in an impaired class must accept a plan or that the plan must be in the best interests of the rejecting Claim or Interest Holder.   The "best interests" test requires that the value of property to be distributed under the plan to the rejecting Claim or Interest Holder may not be less than the rejecting Claim or Interest Holder would have received if the debtor were liquidated under Chapter 7 of the Code.   See Code § 1129(a) for additional confirmation requirements.

A bankruptcy court may confirm a plan even if all impaired classes of Claims and interests do not accept it, although at least one class of impaired Claims must accept the Plan, if there is an impaired class of Claims.   The circumstances under which a bankruptcy court may confirm a plan despite its rejection by one or more classes of Claims or interests are stated in the "cram down" provisions of Code § 1129(b).   Code § 1129(b) provides that a bankruptcy court may confirm a plan notwithstanding its rejection by one or more impaired classes if the court finds that the plan does not discriminate unfairly and that the plan is fair and equitable as to each rejecting class.

With respect to each class of secured Creditors, the "fair and equitable" test requires that each secured Creditor:   (i) retain its liens and receive cash payments having a present value equal to its allowed Secured Claim; (ii) receive the proceeds from the sale of its Collateral; or (iii) realize the indubitable equivalent of its Claim.   With respect to a rejecting class of Unsecured Claims, the "fair and equitable" test requires that either:   (i) each Creditor in the rejecting class must receive property having a present value equal to the allowed amount of its

2

Claim; or (ii) no class junior to the rejecting class will receive or retain any property under the plan. With respect to a class of interests, the "fair and equitable" test requires that either: (i) the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (ii) no class junior to the rejecting class will receive or retain any property under the plan.

Confirmation of a plan will make it binding upon the Debtor, Creditors, and other parties in interest to the bankruptcy case, regardless whether they accepted the plan. The Debtor in Possession urges you to read this disclosure statement carefully; it was prepared to give you adequate information to decide whether to accept or reject the Plan. Note that the Plan includes alternative treatments, dependent on whether Class 22, which is the Class of Unsecured Claims of more than $10,000, accepts or rejects the Plan.

Unless otherwise indicated, the information in this disclosure statement was obtained or derived from the Debtor's records, the Debtor in Possession and its records, and Claimants' filings with the Court.

The financial information in this disclosure statement was not prepared according to Generally Accepted Accounting Principles. Unless otherwise indicated, all information was current as of October 31, 2010.

Other than as set forth in this disclosure statement, the Debtor in Possession makes no representations about itself, its business operations, the value of its property, or the value of any benefits offered under the Plan. No statements or information concerning the Debtor, the Estate,

3

its assets, or any securities are authorized, other than those set forth in this disclosure statement. You should not rely on any representations or inducements made to secure your acceptance of the Plan that are contrary to the information contained in a disclosure statement approved by the Court.

Under the Code, your vote for acceptance or rejection may not be solicited unless you receive a copy of a disclosure statement approved by the Court before, or concurrently with, the solicitation.   The provisions of Code § 1125(b) govern the solicitation of votes on a plan. Violation of those provisions may result in sanctions by the Court, including disallowance of the solicited vote and loss of the "safe harbor" provisions of Code § 1125(e).

## THE DEBTOR

The Debtor is a privately-held Oklahoma corporation formed in late 2002.   At this time, Troy Paul is its sole shareholder, officer, and director.   The Debtor is headquartered in Enid, Oklahoma, and has been in active operation since 2003.

The Debtor provides flatbed transportation services across the lower 48 states.   The Debtor hauls a variety of goods, including pipe, steel, wallboard, coils, paper, lumber and other products used in the construction and oil and gas industries.

The Debtor's fleet primarily consists of:   i) 2007 Model 379 Peterbilt, 2008 Model 367 and 389 Peterbilt and 2009 Model 386 Peterbilt tractors, which are equipped with CAT or Cummins engines; and ii) 2007 to 2009 Reitnouer all-aluminum 48-foot trailers with 50,000 lbs. plus capacity.

The Debtor maintains service terminals in Oklahoma City, Oklahoma; Houston, Texas; and Fort Dodge, Iowa.   The Debtor's primary maintenance facility and driver recruiter are now

4

located in Oklahoma City.   The Debtor's newest location is in Houston, Texas, and consists of a

pipe drop/storage yard and an office location for local and over-the-road freight dispatching.

The Debtor in Possession now employs 142 people.   Two of the Debtor in Possession's

current employees are in management positions, and the remainder of the employees are office

support staff, drivers and maintenance personnel.   In addition to its regular employees, the

Debtor in Possession also contracts with approximately 67 independent owner-operator drivers.

The following table sets out the Debtor's annual gross income and expenses from 2004

through 2009, without considering depreciation.

| YEAR | INCOME | EXPENSES | NET INCOME |
|------|--------|----------|------------|
| 2004 | $3,853,871 | $3,564,847 | $289,024 |
| 2005 | $8,648,195 | $8,031,000 | $617,195 |
| 2006 | $21,955,527 | $20,024,227 | $1,931,300 |
| 2007 | $40,626,981 | $37,003,299 | $3,623,682 |
| 2008 | $62,957,337 | $58,211,041 | $4,746,296 |
| 2009 | $45,495,655 | $40,059,083 | $5,436,572 |

The Debtor's gross income for the period January 1, 2010, through the Petition Date was

$10,787,762.   The figures given above for 2004 through 2007 are from the Debtor's financial

reports; the figures for 2008 and 2009 are from the Debtor's federal income tax returns; and the

figures for 2010 are from the Debtor's accumulated monthly financial statements.

## EVENTS LEADING TO BANKRUPTCY

As in most bankruptcy cases, a combination of factors led the Debtor to file for

Chapter 11 bankruptcy relief.

As suggested by the substantial increases in annual gross income set out above, demand for trucking services increased significantly during the period 2003 through mid-2008.   As demand for trucking services increased, the Debtor took steps it thought prudent to capitalize on the increased demand, which included adding a significant number of tractors and trailers to its fleet.

In adding to its fleet, the Debtor incurred significant, additional secured debt and entered into a number of transactions characterized as leases, which substantially increased the Debtor's monthly break-even point on equipment, which reached a high of $421,221.65 in October of 2008.

As part of expanding its operations, the Debtor also established locations in Sapulpa, Oklahoma; Houston, Texas; Fort Dodge, Iowa; Medicine Lodge, Kansas; and Oklahoma City, Oklahoma, as well as an accounting office in Altus, Oklahoma, and incurred the costs and administrative burden inherent in maintaining multiple locations.

With the expansion of its operation, the Debtor materially increased the number of people it employed.   Including employees and owner/operators, the number of people employed by the Debtor reached a high of 358 people in December 2008.   Labor costs increased commensurately, reaching a high of $1,052,896.42 per month in January 2009.

The economy began to slow in late 2008 and continued to decline through at least December of 2009. The Debtor observed a brief improvement from December of 2009 to March of 2010, but the improvement was neither substantial nor sustained.

6

Although the Debtor has maintained its long-term customers, their demand for the Debtor's services fell sharply as the economy slowed, which is reflected in the decline in the Debtor's annual gross income as set out above.

The Debtor was particularly hard hit because it had focused on hauling for the construction and oil and gas industries, which were severely affected by the economic downturn. With the downturn, some of the Debtor's accounts receivable became uncollectible entirely, and others became more difficult to collect because of the account debtors' financial difficulties.

Decreased demand for hauling services generally also resulted in an over-supply of haulers, which increased competition and caused the industry-wide rate per mile to decrease from $2.09 per mile in October 2008 to $1.64 per mile in February 2009. The drop in per-mile rate further reduced the Debtor's gross income.

As the Debtor began experiencing financial difficulties, its then line-of-credit lender, Bank of Oklahoma declined to fund further. General Electric Capital Corporation ("GECC") and Citizens Bank of Oklahoma stepped in and provided some funding; but to achieve the liquidity necessary to continue to operate, the Debtor eventually began factoring its invoices with RTS Financial Service, Inc. ("RTS"). Through the RTS factoring arrangement, the Debtor quickly received approximately 95 percent of the amount of the factored invoices. The Debtor in Possession, with Court approval, has continued to factor its invoices with RTS on a secured basis.

As its gross income fell, the Debtor soon became unable to meet its current obligations, and fell substantially behind in paying employment taxes. To address the income shortfall, the Debtor began liquidating or otherwise reducing the size of its fleet, reducing its work-force and,

7

when possible, renegotiating its obligations and Troy Paul reduced his salary by twenty-five percent. Other management salaries were also reduced by twenty-five percent, and all non-driving employees' salaries were reduced by ten percent. Unfortunately, the economic decline resulted in sales prices for used tractors and trailers plummeting and resulted in the Debtor's facing deficiency claims in connection with the reduction in its fleet.

In late 2009, Financial Federal Credit, Inc. ("Financial Federal"), a creditor asserting a claim of almost $3,400,000 against the Debtor that was secured by liens against a substantial portion of the Debtor's assets, threatened foreclosure of its lien interests. To avoid loss of the use of the assets against which Financial Federal asserted liens, the Debtor sold those assets to Paul Logistics, Inc., a corporation wholly-owned by Troy Paul's father, Larry Paul. The sale transaction was financed for Paul Logistics, Inc., by Financial Federal in December of 2009, and fully satisfied the Debtor's obligations to Financial Federal. Paul Logistics, Inc., then leased those assets back to the Debtor for $95,717 a month, which was intended by the Debtor to be adequate to cover Paul Logistics, Inc.'s debt service to Financial Federal and compensate Paul Logistics, Inc., for the risk of having become involved in the transaction. As part of Financial Federal's loan to Paul Logistics, Inc., Larry Paul was required to mortgage to Financial Federal realty he owned personally, and Larry Paul, his spouse (Betty Paul), and Troy Paul were required to guaranty Paul Logistics, Inc.'s debt to Financial Federal.

While the Debtor succeeded in reducing the payments required of it every month, and many Creditors were working with the Debtor to resolve its financial difficulties, Toyota Motor Credit Corporation ("Toyota"), and GECC, Colonial Pacific Leasing Corporation ("CPLC") and Transport International Pool Inc. ("TIP") (for convenience, GECC, CPLC, and TIP are

8

collectively referred to as "GE") filed replevin actions against the Debtor in which they sought to recover a significant number of tractors and/or trailers from the Debtor. The Debtor deemed the property Toyota sought to recover as non-essential to the Debtor's future operations and, therefore, allowed Toyota to recover that property without opposition. However, the Debtor believed much of the property GE sought to recover was essential to the Debtor's future operation, but it did not appear state law provided any avenue through which the Debtor would be able to retain, on a long term basis, the property GE sought.

Given the combination of events described above, seeking Chapter 11 bankruptcy protection seemed to be the only option, which the Debtor took on May 18, 2010.

## THE CONDITION AND PERFORMANCE
## OF THE DEBTOR IN POSSESSION

Immediately upon filing for bankruptcy relief, the Debtor in Possession filed and prosecuted the following "first day" motions:

- Debtor's Motion for Interim and Final Orders Under 11 U.S.C. §§ 105(a), 361, 363, and 364 and Bankruptcy Rules 2002, 4001, 6003, and 9014: (A) Authorizing Debtor to Factor, and Incur Post-Petition Secured Indebtedness; (B) Granting Security Interests and Super-Priority Claims; (C) Approving Use of Cash Collateral; and (D) Scheduling Final Hearing (Docket No. 5). The interim order granting this motion was entered on May 20, 2010 (Docket No. 34) and the final order was entered on June 3, 2010 (Docket No. 64).

- Debtor's Motion for Order Authorizing Payment of Employee Wages, Related Taxes, and Critical Vendors, Combined with Brief in Support (Docket No. 6). The order granting this motion was entered on May 21, 2010 (Docket No. 44).

- Debtor's Application for Order Establishing Service List and Limiting Notice, Combined with Brief in Support (Docket No. 7), which was granted by order entered on May 21, 2010 (Docket No. 43).

- Debtor's Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §366: (A) Prohibiting Utility Providers From Altering, Refusing or Discontinuing Service; (B) Deeming Utilities Adequately Assured of Future Performance, and

9

(C) Establishing Procedures for Determining Adequate Assurance of Payment, Combined with Brief in Support (Docket No. 8) with a Supplement filed May 19, 2010 (Docket No. 22).   The interim order granting this motion was entered on May 21, 2010 (Docket No. 41) and the final order granting it was entered on June 3, 2010 (Docket No. 65).

- Debtor's Motion for Order Authorizing: (A) Continued Use of Existing Bank Accounts, Checks and Business Forms, and (B) Payment of Bank Charges (Docket No. 10), which was granted by order entered on May 21, 2010 (Docket No. 42).

- Debtor's Application to Shorten Time and for Expediting and Emergency Consideration of Certain "First Day" Motions (Docket No. 9). The order granting this application was entered on May 19, 2010 (Docket No. 23).

The Debtor in Possession also filed the Debtor's Application for Order Approving

Employment of Attorneys, Combined with Brief in Support (Docket No. 3) on the Petition Date.

The order granting this application was entered on June 15, 2010 (Docket No. 82).

On May 20, 2010, the Debtor's Application for Order Establishing Time Within Which

Proofs of Claim Must be Filed, Procedure for Filing, and Notice Thereof, Combined with Brief in

Support (Docket No. 36) was filed.   The order granting the Debtor's bar date application was

entered May 26, 2010 (Docket No. 60).

On May 24, 2010, the Debtor's Motion for Order Establishing Interim Compensation and

Expense Reimbursement Procedure, Combined with Brief in Support (Docket No. 53) was filed.

The order granting it was entered on June 15, 2010 (Docket No. 83).

The following Creditors were appointed to the Official Unsecured Creditors' Committee

on June 18, 2010 (Docket No. 89):

American Express Bank, FSB
c/o Becket & Lee, LLP
PO Box 3001
Malvern, PA 19355

Miller Truck Lines, LLC
Attn:  Phillip C. Vinson
PO Box 665
Stroud, OK   74079-0665

10

American Express                          Miller Truck Lines Inc.
PO Box 650448                             Dept 1966
Dallas, TX 75265-0448                     Tulsa, OK   74182

Doonan Peterbilt of Great Bend
Attn: Chuck Carper
PO Box 1286
Great Bend, KS 67530

On July 13, 2010, the Debtor in Possession filed the following:

- Debtor's Motion Pursuant to 11 U.S.C. § 365(a) and Rules 6006 and 9014,
  F.R.B.P., for Authorization to Reject Certain "Leases" of Personal Property
  (Docket No. 112). The order granting this motion was entered August 5, 2010
  (Docket No. 139).

- Debtor's Motion for Order Under 11 U.S.C. §§ 105(a), 361, 362 and 363 and Rules
  2002, 4001 and 9014, F.R.Bankr.P., Approving Agreement to Provide
  [Commercial Credit Group] Adequate Protection (Docket No. 113). The order
  granting it was entered August 3, 2010 (Docket No. 132).

On July 29, 2910, an order was entered authorizing the employment of the following as

counsel for the Official Committee of Unsecured Creditors (Docket No. 128), and that order was

amended on August 4, 2010 (Docket No. 137):

Lyle R. Nelson
L. Vance Brown
Eric Huddleston
Karolina D. Roberts
Elias, Books, Brown & Nelson, PC
Two Leadership Square, Suite 1300
211 North Robinson
Oklahoma City, OK 73102-6803

On August 3, 2010, the Debtor in Possession filed Debtor's Motion for Order Authorizing

Payment of Pre-Petition Critical Vendor Claims, Insurance Expenses, Citations and Taxes,

Combined with Brief in Support (Docket No. 133), seeking authority to pay additional critical

vendor claims and expenses which accrued prior to the Petition date.  The Order Shortening

11

Objection Period for this Motion was entered on August 18, 2010 (Docket No. 152), and the Order Granting Debtor's Motion for Order Authorizing Payment of Pre-Petition Critical Vendor Claims, Insurance Expenses, Citations, and Taxes (Docket No. 155), filed August 20, 2010

On August 16, 2010, the Debtor in Possession filed the Debtor's Application for Order Approving Employment of Counsel, Combined with Brief in Support (Docket No. 150), seeking authority to employ, on a contingency-fee basis, legal counsel to prosecute the *Thomason* case described below. The order granting this application was entered August 18, 2010. See Order Approving Employment of Attorneys (Docket No. 153).

On August 25, 2010, the Debtor in Possession filed the Debtor's Motion for Order Enlarging Time within which to Assume or Reject Unexpired Leases of Nonresidential Real Property under which the Debtor Is the Lessee and Brief in Support (Docket No. 160), to allow the Debtor additional time to assess its interests in various unexpired lease agreements. The Order Enlarging Time within which to Assume or Reject Unexpired Leases of Nonresidential Real Property Under which the Debtor Is the Lessee (Docket No. 179) was entered on September 15, 2010.

On August 30, 2010, the Debtor in Possession filed the Debtor's Motion to Approve Website Notice Procedures (Docket No. 163), in an effort to reduce the costs and expenses of mailing notices to the estate, and the Order Authorizing Website Notice Procedures and Notice that Further Service by First Class Mail Will Be Limited and that Further Service Will Be Made by Posting on Website (Docket No. 208), was entered on October 7, 2010. However, upon further consideration, given the issues that might have been created by providing notice exclusively in such a fashion, the Debtor in Possession requested the Court to vacate that Order.

12

The Debtor in Possession's Motion to Extend Exclusivity Period to File a Chapter 11 Plan
and Solicit Acceptance Thereof Pursuant to Section 1121(d) of the Bankruptcy Code (Docket
No. 171) was filed September 9, 2010, in an effort to allow the Debtor in Possession additional
time to fully analyze many of the Proofs of Claims filed by the Creditors.    The Order Granting
Debtor's Motion to Extend Exclusivity Period to File a Chapter 11 Plan and Solicit Acceptance
(Docket No. 201) filed September 28, 2010.

Increased demand for the Debtor's services in the Houston area necessitated that the
Debtor in Possession obtain use of a larger Houston-area yard, and an opportunity arose for the
Debtor in Possession to enter into a new lease agreement with its existing landlord in Houston and
thereby obtain use of a larger tract of land.    The Debtor in Possession filed the Debtor's Motion
Pursuant to 11 USC §363(B)(1) for Authorization to Enter into Lease Agreement, with Brief in
Support (Docket No. 180) on September 15, 2010, seeking approval of the Court to enter into the
new lease agreement.    The Debtor in Possession also filed an Application for Order Shortening
Objection Period to Debtor's Motion for Order for Authority to Enter Lease Agreement (Docket
No. 181).    The Order Shortening Objection Period (Docket No. 186) was entered on
September 16, 2010, and the Order Granting Debtor's Motion for Authority to Enter into Lease
Agreement with East End Equipment Sales, Inc. (Docket No. 196) was entered on September 22,
2010.

The Debtor in Possession also filed the Debtor's Second Motion to Extend Exclusivity
Period to File a Chapter 11 Plan and Solicit Acceptance Thereof Pursuant to Section 1121(d) of the
Bankruptcy Code (Docket No. 228) on November 12, 2010, seeking an additional thirty days to
complete its assessment.    On December 7, 2010, the Court entered an Order Granting Debtor's

13

Second Motion to Extend Exclusivity Period to File a Chapter 11 Plan and Solicit Acceptance
Thereof (Docket No. 241).

On December 7, 2010, the Debtor in Possession filed the Debtor's Application for Order
Authorizing Employment and Compensation of Professionals in the Ordinary Course of Business,
Combined with Brief in Support (Docket No. 240), requesting approval to employ the CPA firm of
BKD, LLP, for the preparation of various tax returns and reports.   The Order Approving
Employment of Professionals was then entered on December 8, 2010 (Docket No. 243).

As of December 14, 2010, the following motions and applications were pending:

- Debtor's Second Motion For Agreed Order Enlarging Time Within Which to
  Assume or Reject Unexpired Leases of Nonresidential Real Property with Brief in
  Support (Docket No. 236).

The Debtor is current in the filing of its monthly operating reports (through October 31,
2010), and is current in payment of its disbursement fees under 28 U.S.C § 1930(6).

Since filing this Case, the Debtor in Possession has stabilized its operation, increased its
revenue, and reduced its expenses.   From the Petition Date through October 31, 2010, the
Debtor in Possession's gross income was $12,935,410.26.   Expenses for the same period were
$11,035,722.89, exclusive of adequate protection payments and lease-related payments.
As part of its effort to reduce expenses, the Debtor in Possession relinquished possession of assets
it believed were non-essential.   By doing so, the Debtor in Possession freed up cash flow that
otherwise would have been required to keep the non-essential assets.   The Debtor also
successfully negotiated a modification of the factoring agreement with RTS Financial Services,
resulting in decreased factoring fees and reserves.

14

The Debtor in Possession has been attempting to negotiate an amendment to the lease between it and Paul Logistics, Inc. The most significant components of the amendment being sought are a purchase option and a reduction of the Debtor in Possession's monthly payment under the lease. In summary, the purchase option price sought would be exercisable at the then outstanding balance of Paul Logistics, Inc.'s obligations to Financial Federal that are secured by the leased assets, less lease payments made after the option is granted. The monthly lease payment reduction sought is to the amount of Paul Logistics, Inc.'s monthly payment to Financial Federal, plus $5,000 a month, with a maximum monthly payment of $95,717. The Debtor in Possession intends to continue pursuit of the above-described lease amendment.

The Debtor in Possession negotiated adequate protection and other agreements during this Case with Creditors holding interests in the tractors, trailers, and other property the Debtor in Possession deems necessary to an effective reorganization, which permitted the Debtor in Possession to continue to use that property consistently with the Debtor in Possession's obligations under the Code. See, Agreed Order Resolving Objection of Transport International Pool, Inc., to Debtor's Request for Authority to Use Cash Collateral or, Alternatively, for an Order Requiring Debtor to Provide Adequate Protection (Docket No. 71); Stipulated and Agreed Order Resolving the Objection of GE Capital Terminating Automatic Stay, Abandoning Property of the Estate, and Rejecting Lease Agreement with GE Capital (Docket No. 72); Stipulated and Agreed Order Resolving the Objection of Colonial Pacific Leasing Corporation; Terminating Automatic Stay; and Abandoning Property of the Estate (Docket No. 73); Order Granting Adequate Protection to Paccar Financial Corp. (Docket No. 114); Agreed Stipulation and Order Approving Adequate Protection of Commercial Credit Group Inc.'s Interests (Docket No. 132); Agreed

15

Stipulation and Order Approving Adequate Protection of Wells Fargo Equipment Finance, Inc.'s

Interest (Docket No. 161); Agreed Stipulation and Order Approving Adequate Protection of TAI

Title Trust's Interests [TAI Title Trust is also referred to as Trans Advantage] (Docket No. 168);

Agreed Order of Transport International Pool, Inc. and Debtor for Approval of Modification of

Adequate Protection Payments (Docket No. 170), and Agreed Stipulation and Order Approving

Adequate Protection of Citizens Bank of Oklahoma's Interests (Docket No. 200).   The adequate

protection agreement with Transport International Pool, Inc., was modified to extend the terms and

increase the payments.   See Agreed Order of Transport International Pool, Inc., and Debtor for

Approval of Modification of Adequate Protection Payments (Docket No. 170).   The adequate

protection agreements with Wells Fargo Equipment Finance, Inc., and TAI Title Trust were also

extended by mutual agreement of the Creditors and the Debtor in Possession.   See Debtor's

Notice and Stipulation of Extension of Adequate Protection Agreement with Wells Fargo

Equipment Finance, Inc. (Docket No. 229), and Debtor's Notice and Stipulation of Extension of

Adequate Protection Agreement with TAI Title Trust (Docket No. 230).

In January of 2011, subsequent to the filing of the original disclosure statement, the Debtor

in Possession entered into a verbal agreement to haul oil while a broken pipeline was being

repaired.   Estimates are that the repair should take approximately 60 days.   The Debtor in

Possession took the steps necessary to perform under the verbal agreement, including gaining use

of tanker trucks suitable to haul oil. The estimated net revenue generated the first month of

performance will be approximately $10,000, but the Debtor in Possession cannot speculate as to

the revenues that may be generated thereafter.   While the Debtor in Possession hoped that its

expansion into oil hauling might develop further opportunities, there is no basis to meaningfully

16

predict whether oil hauling will be a material source of future revenue.

The Debtor in Possession also spent considerable time trying to quantify and appropriately characterize the Estate's liabilities.    See the "Claims Against the Estate" section of this disclosure statement.    Until the Debtor in Possession did so, the reorganizational options realistically available were unclear.

Once the Debtor in Possession satisfied itself that it had more accurately assessed the nature and amount of the Estate's actual liabilities, it turned its attention to formulating a plan of reorganization.    A copy of that Plan was served upon you with this disclosure statement.

## ASSETS AND LIABILITIES

The Estate's assets and liabilities are set out below.

## A.   Available Assets and Their Value

The Estate's assets and their value are as follows:

| ASSET TYPE | FORCED LIQUIDATION VALUE | SECURED CLAIMS[1] | ESTIMATED AMOUNT POTENTIALLY AVAILABLE FOR DISTRIBUTION TO CLAIMANTS HOLDING PRIORITY CLAIMS AND UNSECURED CLAIMS |
|---|---|---|---|
| Cash on Hand (petty cash) | 400.00 | | 400.00 |
| Checking and Savings Accounts; Certificates of Deposit | | | |
| Certificate of Deposit Union Bank of Chandler, OK | 15,000.00 | Brown & Brown of Central OK[2] | 0.00 |
| Checking/Operating Account Coppermark Bank | 26,675.37 | RTS Financial | 26,675.37 |
| Tax Account at Coppermark Bank | 565.00 | RTS Financial | 565.00 |
| Savings/Reserve Account Coppermark Bank | 3,973.59 | RTS Financial | 3,973.59 |
| Savings Account at Bank of the West | 31,513.70 | RTS Financial | 31,513.70 |
| Security Deposits | | | |
| Utilities | 18,290.29 | Deposits with various utilities[3] | 0.00 |

---

[1]  These amounts are based on the Debtor in Possession's estimate of Secured Claims in light of Code § 506 and do not include Claims due Creditors with subordinate security interests that might become Secured Claims if the asset values increased beyond the amounts set out above.   The Debtor in Possession also assumed that RTS Financial, which holds a post-petition contingent claim in connection with invoice factoring that is secured by all accounts, general intangibles related to accounts, equipment and inventory, and proceeds, among other things, would be paid in full from the factored invoices and reserve.   To the extent that assumption should prove to be inaccurate, the estimated amount potentially available for distribution would decrease commensurately.

[2]  Secured by a letter of credit issued by Union Bank of Chandler and backed by the above-described Certificate of Deposit in addition to offset rights.   Brown & Brown contends it is due an additional $52,312 also subject to offset rights.

[3]  The deposits were generally fixed to cover the billing for one month.   In a liquidation, the Debtor in Possession believes the deposits would be applied to satisfy unpaid utility services and would be exhausted.

| Landlords | 20,900.00 | Deposits with various landlords[4] | 0.00 |
|---|---|---|---|
| National American Insurance Company ("NAICO") (held by Brown and Brown) | 113,400.00 | Deposit related to insurance | 0.00[5] |
| RTS Financial Reserve | 5,872.85 | RTS Financial | 5,872.85 |
| Accounts Receivable (average, daily invoices in the process of being factored) | | | |
| Work in Progress | 108,347.96 | RTS Financial | 108,347.96 |
| Reserve Held by RTS Financial | 52,500.00 to 63,000.00 | RTS Financial | 52,500.00 to 63,000.00 |
| Accounts Receivable (non-factored) | | | |
| Deferred Debits/Carrier | 4,209.70 | RTS Financial | 4,209.70 |
| Driver Receivables | 4,854.02 | RTS Financial | 4,854.02 |
| Owner Operator Advances | 117.56 | RTS Financial | 117.56 |
| Retroactive adjustment to insurance premiums based on past year's claim history | Unknown | NAICO | |
| Trade Receivables (figure is net of a bad-debt reserve of 219,180.21) | 103,144.11 | Citizens Bank of Oklahoma[6] and RTS Financial | 0.00 |
| Notes Receivable | | | |
| Troy Paul | 28,047.15 | 0.00 | 0.00[7] |
| Paul Logistics | 20,000.00 | 0.00 | 0.00[8] |
| Inventory and Equipment | | | |

---

[4]  The Debtor in Possession believes the leases would be rejected in a liquidation and unpaid rent and the resulting rejection claims would entirely offset the deposits

[5]  The Debtor in Possession runs approximately 2 months in arrears on payment of insurance premiums and, consequently, would not expect a return of this deposit.

[6]  Secured Claim of Citizens Bank of Oklahoma (estimated to be $492,368.65).  In assessing the existence of equity, the Debtor in Possession applied asset values in the order they appear above; in a liquidation, the Creditor would not be constrained to proceed in that fashion.

[7]  The note from Troy Paul is not considered to be collectible, particularly in a liquidation.

[8]  The note from Paul Logistics is not considered to be collectible, particularly in a liquidation.  Paul Logistics is a lessor to the Debtor, and its lease would presumably be rejected in a liquidation, which would give rise to a rejection Claim that would entirely offset the amount of the Paul Logistics note.

| | | | |
|---|---|---|---|
| Office Equipment and Furniture | 103,730.00[9] | Citizens Bank of Oklahoma[5] and RTS Financial | 0.00 |
| Equipment/Inventory | 495,167.50[9] | Citizens Bank of Oklahoma[5] and RTS Financial | 209,672.96 |
| **Vehicles** | | | |
| 2008 GMC Yukon | 19,100.00[9] | GMAC ($28,667.39) | 0.00 |
| 2009 GMC Sierra Pickup | 24,875.00 | GMAC ($28,806.45) | 0.00 |
| Yard Truck (Ottawa Tractor) | 7,500.00 | Citizens Bank of Oklahoma[5] and RTS Financial | 7,500.00 |
| Vehicles/Service Cars | 31,750.00[10] | Citizens Bank of Oklahoma[5] and RTS Financial | 31,750.00 |
| **Financed Equipment** | | | |
| Commercial Credit Group, Inc.: 2009 Peterbilt 386 tractors (22) | 1,306,800.00 | 1,985,324.17 | 0.00 |
| Paccar: 2007 Peterbilt 379 tractors (13) | 528,700.00 | 747,905 | 0.00 |
| Transport International Pool, Inc.: 2007-2008 Reitnouer trailers (170) | 2,741,300.00 | 3,357,277 | 0.00 |
| **Leased Equipment** | | | |
| Wells Fargo: 2009 Reitnouer trailers (36) | 699,300.00 | Lease | 0.00 |
| Paccar: 2008-2009 Peterbilt 386 & 389 tractors (20) | 567,800.00 | Lease | 0.00 |
| Trans Advantage (TAI Title Trust): 2009 Peterbilt 386 and 389 tractors (53) | 2,990,025.00 | Lease | 0.00 |
| Paul Logistics: 2008 Peterbilt 367 tractors (10) | 473,450.00 | Lease | 0.00 |
| Paul Logistics: | 1,010,525.00 | Lease | 0.00 |

---

[9]  Based on Kelley Blue Book trade-in value, for property in fair condition and sold in this geographic area.

[10]  Based on an appraisal by United Country-Lippard Auctioneers, Inc., Troy D. Lippard, CAI, dated October 23, 2009, which was characterized by the appraiser as providing the "fair market value if this equipment were sold in today's market at public auction."

| | | | |
|---|---|---|---|
| 2009 Reitnouer 48' trailers (54) | | | |
| Paul Logistics:<br>2007 Ranco 42' trailers (10) | 242,250.00 | Lease | 0.00 |
| Paul Logistics:<br>Miscellaneous units (20) | 254,450.00 | Lease | 0.00 |
| Other | | | |
| Various Insurance Policies | 0.00 | 0.00 | 0.00 |
| Real Estate Leases (4) | 0.00 | 0.00 | 0.00 |
| Shop Building, Enid, Oklahoma | 103,879.33 | 959,965.40[11] | 0.00 |

As indicated above, the Estate consists of owned assets, and what the underlying documents characterize as leased assets. The "leased" assets consist of 83 tractors, 100 trailers, and various pieces of other equipment, which Taylor & Martin, Inc. values in liquidation at $6,806,375. Filed proofs of claim with respect to the "leased" assets total $9,704,986.88.

To the extent the Estate's interests in the "leased" assets are interests under "true leases," as opposed to transactions that might be re-characterized as secured financing transactions, the Estate's reorganization options available with respect to those assets absent a negotiated resolution would be severely limited by the constraints imposed by Code §365; *i.e.*, either assumption, with prompt cure of existing defaults and adequate assurance of future performance, or rejection, with the attendant loss of the leased property.

The Debtor in Possession proposes under the Plan to restructure obligations to Paccar Financial Corp. and Transadvantage (TAI Trust) under what are referred to as "TRAC leases."

---

[11] The subject building is affixed to real property that was awarded to Stacia Paul in the Decree of Divorce entered in the case of *In re the Marriage of Stacia Paul and Troy Paul*, Garfield County, Case No. FD-2009-147-05. In addition, the real property is currently the subject of two pending foreclosure cases, *Deutsche Bank Trust Company Americas f/k/a Bankers Trust Company as Trustee vs. Troy Paul, et al.*, Garfield County case number CJ-2010-439-02 and Coppermark Bank vs. Paul Transportation, Inc., Troy E. Paul, et al., Garfield County, Case No. CJ-2010-445, in which the combined alleged balances exceed $782,000 plus interest, attorneys' fees and costs, and additional fees and expenses. The property is also encumbered by tax liens filed by the Oklahoma Tax Commission ($45,557.14) and the Internal Revenue Service ($132,408.24), as well as numerous judgment liens and attorney's liens.

Under the agreements with Paccar Financial Corp., the Debtor was obligated to make a

$564,820.08 "TRAC" balloon payment on December 21, 2010, on Account 5

(900-651-601-5906581), and a $276,786.25 "TRAC" balloon payment on January 12, 2011, on

Account 6 (900-651-601-5913314).    A $309,104.80 "TRAC" balloon payment will be due to

Paccar Financial Corp. on December 19, 2011, on Account 7 (900-7651-601-5979562).    Paccar

Financial Corp. also claims it is due an additional $27,207.64, $22,651.38, and $31,957.26 on

Account 5, Account, 6, and Account 7, respectively.    Absent a restructure, a $1,653,264.00

"TRAC" balloon payment will be due to Transadvantage (TAI Trust) on April 12, 2011 on

Account 60006479 and a $1,592,032 "TRAC" balloon payment will be due on April 22, 2011 on

Account 60006611.    Transadvantage (TAI Trust) claims an additional $321,800.62 is due

related to Account 60006479, and an additional $114,832.66 is due related to Account 6000661.

If restructured as proposed, no "TRAC" balloon payments would be required under

Transadvantage (TAI Trust) "TRAC leases" and the "TRAC" balloon payments due to Paccar

Financial Corp. on Account 5 and 6 will be extended for a year from the Effective Date.    The

"TRAC" balloon payment on Paccar Financial Corp. Account 7 will not occur until December of

2011.    Even if other arrangements are not made to restructure balloon payments becoming due

on "TRAC leases" being assumed under the Plan, the Debtor in Possession believes that

liquidation of the leased equipment will fully satisfy those "TRAC" balloon payments, assuming

the liquidation occurs for anything approaching the equipment's fair market value.

If the "TRAC leases" with Paccar Financial Corp. and Transadvantage (TAI Trust) are

"true" unexpired leases or executory contracts, rather than financing transactions, the Debtor in

Possession cannot restructure those obligations as proposed under the Plan unless Paccar

22

Financial Corp. and Transadvantage (TAI Trust) consent to the restructure.   The Debtor in Possession believes that Paccar Financial Corp. and Transadvantage (TAI Trust) have agreed to the restructure of their "TRAC leases" as set out in the Plan.

Should Paccar Financial Corp. not consent to the restructure and should those obligations be "true" unexpired leases, rather than financing transactions, the Debtor in Possession estimates that the loss of the Paccar Financial Corp. "leased" equipment, which is approximately 17% of the Debtor in Possession's tractor fleet, would result in a reduction of approximately $320,000 in the monthly gross income set forth on Exhibit 2, a reduction of approximately $276,615 in the monthly expenses set forth on Exhibit 2, and relieve the Reorganized Debtor or New Paul, as the case might be, from the obligation to make the payments proposed to Paccar Financial Corp. on the "lease" obligations.

If Transadvantage (TAI Trust) had not agreed to the restructure of its "TRAC leases" as set out in the Plan, the Debtor in Possession estimates that the loss of the Transadvantage (TAI Trust) "leased" equipment, which is approximately 45% of its tractor fleet, would result in a reduction in the monthly gross income set forth on Exhibit 2 of approximately $848,000, a reduction of approximately $745,854 in the monthly expenses set forth on Exhibit 2, and relieve the Reorganized Debtor or New Paul, as the case might be, from the obligation to make the monthly payments proposed to Transadvantage (TAI Trust) on the "lease" obligations.

The Debtor in Possession's estimates of the impact of the loss of the "TRAC lease" equipment are based upon the Debtor's historical average gross revenue of $16,000 per tractor, and an average 3% profit margin per tractor.

If the "TRAC lease" obligations to Paccar Financial Corp. and Transadvantage (TAI Trust) were determined to be financing transactions, it appears the monthly payments proposed to Paccar Financial Corp. under the Plan would total approximately $20,000, rather than the $32,947.90 in monthly payments proposed to restructure the "TRAC leases." If the "TRAC lease" obligations to Transadvantage (TAI Trust) were determined to be financing transactions, it appears the monthly payments proposed to Transadvantage (TAI Trust) under the Plan would total approximately $59,725, rather than the $76,705.56 in monthly payments proposed to restructure the Transadvantage (TAI Trust) "TRAC leases."

In addition to making the lease payments, the Debtor in Possession is also obligated under all leases to maintain the leased personal property. Projected maintenance costs of both leased and financed equipment are included in the Debtor in Possession's projections.

Most, if not all, of the Debtor in Possession's heavy equipment is covered by extended warranties, which will expire at various times. While warranty coverage will reduce some of the repair costs of covered losses, the vast majority of the monthly maintenance expense is incurred as a result of normal wear and tear, which is not covered by warranties, extended or otherwise. Warranty coverage has not historically been of significance to the Debtor and its operation.

The Reorganized Debtor (or New Paul, should Class 22 reject the Plan) shall have the right to seek a determination whether a transaction is a "true lease" or a secured financing transaction or is otherwise not an unexpired lease or executory contract. If such a transaction is determined to be a secured financing transaction or something other than an unexpired lease or executory contract, the Claimant shall receive the same treatment as proposed for Class 3.

Should the challenged transaction be determined to be a "true lease," the Claimant shall receive the treatment provided for in the Plan for an assumed unexpired lease.

Unless otherwise noted, the liquidation values given above in the table were obtained from an appraisal dated November 10, 2010, performed by Taylor & Martin, Inc., and are based on: i) equipment being in average-to-above-average condition; ii) recent selling prices of similar equipment sold through Taylor & Martin, Inc., and other nationally-advertised auctions; iii) advertised retail asking prices and/or solicited dealer quotes; and iv) current and anticipated market trends.

Pre-Petition, Kenneth W. Klingenberg, an Oklahoma City, Oklahoma-based certified public accountant and attorney who frequently values businesses, and was court appointed in Troy Paul's divorce case to offer an opinion about the value of the Debtor, opined that, as of September 30, 2009, the Debtor had a negative fair market value of $4,354,623.98 using a net-asset method of valuation.    Mr. Klingenberg's opinion was based on the Debtor's unaudited books and records and on fixed-asset appraisals performed by Taylor & Martin, Inc., and Troy Lippard, which were dated October 7, 2009, and October 23, 2009, respectively.    Although market conditions, and thus values, appear to have improved significantly since Mr. Klingenberg's valuation, and various obligations considered in his valuation have been satisfied, his valuation nonetheless provides information that parties in interest might find relevant.

The assets listed above do not include amounts the Estate may be able to recover as avoidable transfers or under other theories.    The Debtor in Possession has not undertaken a complete analysis of the avoidability of disbursements made in the 90-day period immediately

preceding the filing of this Case (the "Preference Period"), which based on the check or wire dates totaled $6,135,031.22, and has not undertaken any analysis of transfers occurring prior to the Preference Period, although avoidable transfers may have occurred prior to the Preference Period.    By way of example, a complete preference analysis would entail, at a minimum, identifying the date each payment actually cleared, rather than the check date, and assessing the potential applicability of the "ordinary course" and "new value" preference exceptions, all of which would be time consuming and expensive.    Given the time and cost involved, and the uncertainty of the benefits, if any, which might flow from such an analysis, the Debtor in Possession has limited its analysis to date to the following general information.

Of the disbursements made during the Preference Period, $219,702.72 was disbursed to Creditors who each received less than an aggregate of $5,475.00 during the Preference Period. It appears fairly clear that those disbursements would be insulated from avoidance by Code §547(c)(9), and as a result, those amounts are excluded entirely from the figures given below.

During the Preference Period, the Debtor disbursed $4,949,761.53 on obligations it reports were 30 days or less from its invoice or comparable dates.    While only a general observation, it is not likely many payments the Debtor made to Creditors 30 days or less from the invoice or comparable date would be avoidable as preferences under Code § 547.

The Debtor disbursed $965,566.97 on obligations the Debtor reports were more than 30 days from its invoice or comparable dates.    Of that amount, $855,881.07 was disbursed on obligations the Debtor reports were more than 45 days from its invoice or comparable dates. While again only a general observation, the prospects a disbursement would be avoidable as a

26

preference increases as the length of time between the invoice or comparable date and the payment increases.

The following table summarizes disbursements made by the Debtor during the Preference Period, as reflected by check or wire dates, that exceed the Code §547(c)(9) threshold:

| Payee | Amount (30 and Under) | Amount (31-45) | Amount (Over 45) | Total | | Goods or Services Provided |
|---|---|---|---|---|---|---|
| | | | | | | |
| AFCO Insurance | 124.92 | 9,369.93 | 0.00 | 9,494.85 | | Insurance |
| AT&T | 9,674.74 | 100.82 | 100.36 | 9,875.92 | | Land phone and internet |
| AT&T Mobility | 14,209.76 | 0.00 | 0.00 | 14,209.76 | | Cell phones |
| Bank of Oklahoma | 12,499.36 | 0.00 | 0.00 | 12,499.36 | | Payments in connection with Medicine Lodge property |
| Blue Cross | 110,263.10 | 0.00 | 189,377.60 | 299,640.70 | | Insurance |
| Brown & Brown | 338,919.37 | 20,090.00 | 416,902.07 | 755,911.44 | | Insurance |
| Citizens Bank | 32,500.00 | 0.00 | 0.00 | 32,500.00 | | Secured Claim or Equipment Lease |
| Comdata | 2,464,100.68 | 2,143.70 | -0.26 | 2,466,244.12 | | Fuel cards |
| Commercial Credit | 79,034.00 | 0.00 | 0.00 | 79,034.00 | | Secured Claim or Equipment Lease |
| Compliance Safety | 0.00 | 2,058.00 | 5,132.00 | 7,190.00 | | Drug screens |
| Continental American Ins. | 16,884.79 | 16,094.93 | 0.00 | 32,979.72 | | Insurance |
| Continental Western Ins. | 0.00 | 25,169.00 | 0.00 | 25,169.00 | | Insurance |
| DCW | 20,377.22 | 0.00 | 0.00 | 20,377.22 | | Owner-Operator |
| Dept of Public Safety | 10,500.00 | 0.00 | 0.00 | 10,500.00 | | Permits |
| Doonan Peterbilt | 4,095.19 | 287.50 | 45,571.53 | 49,954.22 | | Truck repair and parts |
| Doonan Truck | 0.00 | 0.00 | 9,876.81 | 9,876.81 | | Truck repair and parts |
| Dothan Tarpaulin | 0.00 | 0.00 | 10,202.31 | 10,202.31 | | New tarps and tarp repair |
| Double B Trucking | 5,757.00 | 0.00 | 0.00 | 5,757.00 | | Tarping service |
| East End Equipment | 21,800.00 | 0.00 | 0.00 | 21,800.00 | | Real Property Lease |
| EFS Transportation | 190,000.00 | 0.00 | 0.00 | 190,000.00 | | Fuel and Maintenance |
| Frontier Leasing | 246,084.80 | 0.00 | 0.00 | 246,084.80 | | Brokerage |
| GMAC | 8,000.00 | 0.00 | 0.00 | 8,000.00 | | Secured Claim or Equipment Lease |
| IMM Enterprises | 14,850.00 | 0.00 | 0.00 | 14,850.00 | | Computer support |
| Jon R Ford | 20,000.00 | 0.00 | 0.00 | 20,000.00 | | Legal Fees |
| K & S Tire | 9,715.48 | 200.00 | 0.00 | 9,915.48 | | New tires and tire repair |
| Kline Kline Elliott & Bryant | 50,000.00 | 0.00 | 0.00 | 50,000.00 | | Retainer |
| Landstar Legion | 5,492.00 | 0.00 | 0.00 | 5,492.00 | | Brokerage |

27

| Payee | Amount (30 and Under) | Amount (31-45) | Amount (Over 45) | Total | | Goods or Services Provided |
|---|---|---|---|---|---|---|
| Livewire Holdings | 0.00 | 0.00 | 15,000.00 | 15,000.00 | | Real Property Lease |
| Majors Investments | 19,285.00 | 0.00 | 0.00 | 19,285.00 | | Real Property Lease |
| National American Ins. | 0.00 | 0.00 | 9,740.86 | 9,740.86 | | Insurance |
| Office of the Texas Att | 13,307.66 | 0.00 | 0.00 | 13,307.66 | | Employee Child Support payments |
| OG&E | 5,519.60 | 0.00 | 0.00 | 5,519.60 | | electricity |
| OK DHS | 11,696.42 | 0.00 | 0.00 | 11,696.42 | | Employee Child Support payments |
| Oklahoma Tax Commission | 4,491.17 | 0.00 | 33,076.00 | 37,567.17 | | Taxes |
| ONG | 6,111.89 | 0.00 | 0.00 | 6,111.89 | | Natural gas |
| Paccar Financial | 24,696.00 | 0.00 | 0.00 | 24,696.00 | | Secured Claim or Equipment Lease |
| Paul Logistics | 79,970.00 | 0.00 | 0.00 | 79,970.00 | | Secured Claim or Equipment Lease |
| Pikepass | 46,000.00 | 0.00 | 0.00 | 46,000.00 | | Pikepass for Oklahoma |
| Qualcomm Inc. | 0.00 | 9,658.17 | 19,376.53 | 29,034.70 | | Satellite tracking system for trucks |
| Republic Paperboard | 6,435.00 | 2,925.00 | 5,260.00 | 14,620.00 | | Tarping service |
| Rogers Premier | 70,494.43 | 5,957.58 | 0.00 | 76,452.01 | | Tarping service |
| Rush Truck Centers | 39,290.27 | 9,061.15 | 0.00 | 48,351.42 | | Truck repair and parts |
| T & W Tire | 98,122.18 | 543.43 | 0.00 | 98,665.61 | | New tire & tire repair |
| Trans Advantage | 78,576.40 | 0.00 | 0.00 | 78,576.40 | | Secured Claim or Equipment Lease |
| Transflo Express | 912.90 | 2,789.80 | 7,611.90 | 11,314.60 | | Scanning system for invoices and bol |
| Transport Loading | 18,389.00 | 1,612.00 | 0.00 | 20,001.00 | | Tarping service |
| Troy Paul | 43,000.00 | 0.00 | 0.00 | 43,000.00 | | Rent and alimony |
| United States Treasury | 22,506.77 | 0.00 | 88,653.36 | 66,146.59 | | Taxes |
| Wells Fargo | 38,556.00 | 0.00 | 0.00 | 38,556.00 | | Secured Claim or Equipment Lease |
| Western Marketing | 4,083.13 | 1,624.89 | 0.00 | 5,708.02 | | Oil and parts for shop |
| Owner Operators | 678,448.84 | | | 678,448.84 | | Compensation and Expense Reimbursement (Amount Approximate) |
| | | | | 5,915,328.50 | | |

Of the payments reflected above, $335,000 was routed through Coppermark Bank for insurance premiums paid by wire transfer to Blue Cross and Brown & Brown of Central OK.

While not all-encompassing, a substantial part of the disbursements reflected above fall into the following categories:   i) payments to owner/operators; ii) payments on personal

28

property leases or Secured Claims; iii) payments on insurance-related matters; iv) payments on taxes; and v) pre-payments.    Given the potential differences between the rights of Claimants holding Claims in these categories and the rights of the holders of general Unsecured Claims, and the potential impact of those differences on the avoidability of transfers, the following paragraphs reflect the payments made in each of these categories.

As shown above, the Debtor disbursed $678,448.84 to owner/operators during the Preference Period.    Given that owner/operators were generally being paid for current services, it is not likely those amounts constitute preferences under Code § 547.

The Debtor paid $341,333.40 on leases or Secured Claims related to its equipment and vehicles during the Preference Period.    See payments summarized above to Citizens Bank, Commercial Credit, GMAC, Paccar Financial, Paul Logistics, Trans Advantage, and Wells Fargo.    To the extent those payments were made on leases being assumed under the Plan or on Claims that were fully secured, they would not be avoidable as preferences.    The Debtor also paid $56,085.00 during the Preference Period on real property leases.    See payments above to East End Equipment, Live Wire Holdings, and Major Investments.    To the extent those real property leases are being assumed under the Plan, which is proposed under the Plan, payments made on them would not be avoidable as preferences either.[12]

Insurance-related payments, which totaled $686,744.39 of the payments made on obligations more than 30 days from its invoice date and $466,192.18 in the 30-day or under category, are not likely to be recoverable if made in connection with executory contracts being assumed under the Plan.    See, generally, payments summarized above to AFCO Insurance, Blue

---

[12] Rejection of executory contracts and unexpired leases under Code § 365, as would be likely in a Chapter 7 liquidation, would increase the probability the non-Debtor parties to those contracts and leases had received avoidable preferences.

29

Cross Blue Shield, Brown & Brown of Central OK, Continental American Insurance, Continental Western Insurance, and National American Insurance. Under the Plan, the Debtor in Possession intends to assume all executory insurance contracts.

Given the priority of most taxes under the Code, tax payments, which were $121,729.36 of the payments in the more than 30-day category and $26,997.94 in the 30-day or under category, are not likely to be avoidable as preferences. See payments to the Oklahoma Tax Commission and the United States Treasury summarized above.

Fifty thousand dollars of the amount disbursed by the Debtor in the Preference Period was to the Debtor's counsel, Kline, Kline, Elliot & Bryant, P.C., as a retainer for future services in connection with this Case. Pikepass was paid $46,000 for tolls, most or all of which were being pre-paid. To the extent payments were not being made on antecedent debts, they would not be avoidable as preferences.

The disbursements of $11,696.42 to the Oklahoma Department of Human Services and $13,307.66 to the Office of the Texas Attorney General were on garnishments and the like against employees or owner/operators and were not of Debtor funds. As a result, those disbursements would not be avoidable.

The Court authorized the Debtor in Possession to pay various Pre-Petition Creditors as "critical vendors." See Docket Nos. 6, 44, 133 and 155. To the extent a payee was designated and paid Post-Petition as a critical vendor, the prospect of successfully recovering any preferential payment it may have received may have been reduced, if not eliminated. The following, who were paid an aggregate of $1,123,715.88 during the Preference Period, were designated and paid as critical vendors: AFCO Insurance, Brown & Brown of Central OK,

30

Compliance Safety, Continental American Insurance, Department of Public Safety, Doonan

Peterbilt, Double B Trucking, IMM Enterprises, K&S Tire, National American Insurance,

Pikepass, Qualcomm Inc., Republic Paperboard, Rogers Premier, Transflo Express, and

Transport Loading.    As you will note, many of these critical vendors held Claims and rights of a

type such that Pre-Petition payments to them were not likely to have been avoidable as

preferences.

As shown above, Comdata Corp. was paid $2,466,244.12 during the Preference Period and

was paid more by far than anyone else receiving payment during that period.   Pre-Petition, the

Debtor used a line of credit with Comdata Corp. to centralize how the Debtor's employees and

owner/operators paid for fuel and maintenance while they were out on the road.   Beginning in

February 2010, Comdata Corp. began reducing significantly the Debtor's available credit such that

drivers could not pay for necessary fuel and maintenance.   In order to ensure that its drivers had

adequate credit available while they were on the road, some of the Debtor's Pre-Petition payments

to Comdata Corp. were in excess of the actual amount invoiced.   Notwithstanding those excess

payments made by the Debtor, Comdata Corp. filed a proof of Claim in the amount of

$162,386.09, of which $45,499.91 was for invoices dated on or after the date of the last

Pre-Petition payment made by the Debtor.

Shortly before the Petition Date, the Debtor switched to EFS Transportation, which was

paid $190,000 during the Preference Period, to provide the services previously provided by

Comdata.   Given the Debtor's very short relationship with EFS Transportation Pre-Petition, it is

unlikely any payments to it would be avoidable as a preference.

31

Troy Paul was paid $43,000 during the 90-day period preceding bankruptcy. That amount was broken down as $17,500 for alimony and child support payments, $24,000 for rent on the Debtor's Medicine Lodge, Kansas, location, and $1,500 for fuel reimbursement. The alimony and child support payments in particular may be avoidable as fraudulent transfers to, or for the benefit of, Troy Paul or Stacia Paul, who is Troy Paul's ex-wife. Undoubtedly, other transactions before the Preference Period could have given rise to causes of action, too. However, the near-term collectability of any viable action against Troy Paul, who is a guarantor or otherwise liable on many of the more significant Claims against the Estate, or against Stacia Paul, is extremely doubtful in light of their known assets and liabilities.

While the Debtor in Possession makes a number of general comments about avoidability in this disclosure statement, and believes those comments to be accurate, those comments are made without prejudice to the pursuit of any Avoidance Actions against any transferee should further analysis indicate such an avoidance action is warranted. The ability to pursue all causes of action is expressly preserved. The omission of any discussion in this disclosure statement of the payments made to a particular Creditor during the Preference Period should not be construed as an indication the Debtor in Possession believes the payments made were avoidable preferences.

The Debtor in Possession is not currently aware of any actions it might hold under Code §§ 544, 548, or 549, or other causes of action, except as may be set forth elsewhere herein. However, Stacia Paul has suggested that the lease transaction between the Debtor and Paul Logistics, Inc., and what Paul Logistics, Inc., did with payments under it, may be actionable. The Debtor in Possession denies any impropriety in connection with the Paul Logistics, Inc., lease.

32

As shown by the "Claims Against the Estate" section of the Disclosure Statement, substantial Priority Claims have been asserted.   Under the Code, in the context of a Chapter 7 liquidation, Priority Claims must be paid in full before holders of Unsecured Claims would be entitled to receive anything from the net proceeds of any successfully-prosecuted Avoidance Action.   As a result, the Debtor in Possession does not view Avoidance Actions as a source of material recovery for Unsecured Creditors, particularly if litigation costs are considered.

The omission of assets, either from the Schedules filed by the Debtor in Possession or from this disclosure statement, shall not prevent the Estate representative from pursuing any cause of action or acquiring and enforcing title to any asset.

Any and all Avoidance Actions against Bank of Oklahoma and Comdata and Western Marketing shall constitute the Designated Avoidance Actions under the Plan and, accordingly, shall vest in the Liquidating Trust if Class 22 accepts the Plan, rather than vest in the Reorganized Debtor.   Potential Avoidance Actions that are not within the scope of the Designated Avoidance Actions fall generally into several categories:   (a) payments made on executory contracts or unexpired leases to be assumed under the Plan, which given the requirements of assumption would render avoidance valueless; (b) payments on Secured or Priority Claims, the avoidability of which is questionable; or (c) payments made to critical vendors where the avoidability of the payments is doubtful and the benefit of avoidance could easily be outweighed by the downside of destroying the relationship with the critical vendor.

## B.   Claims Against the Estate

The Debtor in Possession believes that the Claims listed in the Schedules and the filed proofs of Claim do not accurately reflect the actual amount, type, and priority of Claims

33

enforceable against the Estate.   As a result, the Debtor in Possession has provided two sets of

Claim figures below. The first set gives the Claims as evidenced by the Schedules and the

timely-filed proofs of Claim; the second set of figures gives the Debtor in Possession's estimate

of its actual liabilities, which may include amounts that are not reflected in the Schedules or

timely-filed proofs of Claim and that may not be allowed Claims ultimately.[13]

In setting out the undisputed, noncontingent, liquidated Claims listed in the Schedules and

evidenced by proofs of Claim filed through the Bar Date, what appeared to be duplicate Claims

were omitted, any apparent misclassifications by the Court clerk were corrected, and Bankruptcy

Rule 3003(c)(4) was applied.   In stating Secured Claims, the Debtor in Possession did not value

Collateral, unless the Creditor did so in its proof of Claim, or estimate the allowable amount, if

any, of Post-Petition interest, attorneys' fees, or other charges.

**Summary of Pre-Petition Claims**
**evidenced by the Schedules and the timely-filed proofs of Claim**

| TYPE OF CLAIM | AMOUNT |
|---|---|
| Priority Claims | 878,705.33 |
| Secured Claims | 11,689,113.85 |
| Unsecured Claims | 15,591,947.29 |

The Internal Revenue Service and the Oklahoma Tax Commission collectively hold

73.7 percent of the Priority Claims.

---

[13]    The Court established July 23, 2010, as the Bar Date for filing proofs of Claim in the Case.   However, the Clerk of the Court sent out notice that the bar date for governmental units was November 15, 2010.   The Debtor in Possession is not taking any position at this point on the effect the Clerk's notice may have had with respect to Claims asserted by governmental units.

Claimants holding a total of $464,744.05 in Unsecured Claims listed in the Schedules as disputed, contingent, or unliquidated did not file proofs of Claim timely, and those Claims are not included in the Unsecured Claim figure given above.   Additionally, the Debtor in Possession received $53,885.77 in Priority Claims and $560,377.44 in Unsecured Claims filed after the Bar Date, which are not included in the figures given above, except to the extent they were listed as undisputed, noncontingent, liquidated Claims in the Schedules.   The largest Unsecured Claim filed after the Bar Date was for $500,000 in estimated workers' compensation liability and was filed by the Oklahoma Workers' Compensation Court and Oklahoma Individual Self-Insured Guaranty Fund.

## The Debtor in Possession's estimate of its actual liabilities[14]

| TYPE OF CLAIM | AMOUNT |
| --- | --- |
| Estimated unpaid administrative expenses at any given time, without adequate protection and lease payments, which total $330,453.46 per month, professional fees, or amounts as to which there are deposits | 350,000.00[15] |
| Pre-Petition Priority | 662,563.68 |
| Secured Claims | 6,884,664.18 |
| Unsecured Claims | 3,410,800.19 |

The Debtor in Possession's estimate of its actual liabilities differs for many reasons from the liabilities allowed pursuant to Code § 1111(a) and the Claims evidenced by timely-filed

---

[14]   Notwithstanding the Debtor in Possession's estimate of its actual liabilities, the Debtor in Possession reserves all of its rights to dispute, or to assert offsets or defenses to, any Claim on any grounds, including, but not limited to, liability, amount, priority, status, or classification.

[15]   This amount does not include between $1.5 to $1.8 million in contingent liability to RTS Financial Services on factored invoices.

proofs of Claim. These reasons include, but are not limited to, Post-Petition payments, priority proofs of Claim including amounts not entitled to priority, and disputes about amounts owed.

Estimated administrative expenses are based on the Debtor in Possession's books and records. Estimated Priority Claims are based on the information given in filed proofs of Claim and the Debtor's and Debtor in Possession's records.

In presenting its estimate of Secured Claims, the Debtor in Possession re-characterized any Claim that is not secured by Property of the Estate as an Unsecured Claim. After that adjustment, Secured Claims total approximately $6,884,664.18. As evidenced by its filed proof of Claim, TIP holds approximately $3,227,900 of that amount. TIP liquidated some of its Collateral Post-Petition, but its Secured Claim as evidenced by its filed proof of Claim has not been amended to reflect any reduction in its Secured Claim. The Debtor in Possession has communicated with TIP about its Secured Claims post Collateral liquidation in an effort to more accurately present the Estate's actual liabilities, and, while it may not agree with the figures TIP provided, and reserves the right to challenge TIP's Claim, the Debtor in Possession has used TIP's figures to present the Debtor in Possession's estimate of its actual liability on Secured Claims. The Debtor in Possession's estimated Secured Claims do not take into account adequate protection payments made during the Case, which could further reduce the Secured Claims.

While Unsecured Claims as asserted total $15,591,947.29, the Debtor in Possession believes deducting Claims related to unexpired leases it proposes to assume is appropriate. Were those Claims not deducted, the Unsecured Claims to be dealt with under Classes 21 and 22 of the Plan would be grossly overstated. By deducting the Claims asserted by lessors under leases the Debtor in Possession intends to assume, the Unsecured Claims total is reduced to

36

$5,995,433.03. The excluded Claims would, however, be relevant in the context of liquidation, to the extent they were allowed Unsecured Claims. See Exhibit A to the Plan for additional information related to executory contracts and unexpired leases the Debtor in Possession proposes to assume.

Of the $5,995,433.03 in Unsecured Claims remaining after deducting Claims related to leases to be assumed under the Plan, GECC asserted it is owed approximately $2,420,000, TIP asserted it is owed approximately $992,000, CPLC asserted it is owed approximately $399,000, and Toyota asserted it is owed approximately $1,600,000. All of the property in which GECC, CPLC, and Toyota asserted an interest has been liquidated, and some of TIP's Collateral was liquidated. While Toyota amended its proofs of Claims after the disposition of the property returned to it, GECC, CPLC and TIP have not. The Debtor in Possession has communicated with GECC, CPLC, and TIP about their Unsecured Claims in an effort to more accurately present the Estate's actual liabilities and has used the figures provided by them after the property disposition to present the Debtor in Possession's estimate of its actual liability on Unsecured Claims, but continues to believe at least some of those Claims may be subject to further reduction and reserves the right to challenge those Claims. From communications with those Creditors, GECC's Unsecured Claim was reduced to $1,481,369.95, CPLC's Unsecured Claim was reduced to $249,413.73, Toyota's Unsecured Claim was reduced to $493,151.17, and TIP's Unsecured Claim was eliminated entirely. The Debtor in Possession believes that at least some of these Claims may still be overstated.

Finally, the Debtor in Possession disputes it is liable on approximately $603,500.00 in the aggregate of other asserted Unsecured Claims. After deducting those disputed Claims and

37

making the other adjustments discussed above, the Unsecured Claims upon which the Debtor in Possession believes it is liable are reduced to $3,410,800.19.

One hundred eighty-eight Claimants hold Unsecured Claims of $10,000 or less, with those Claims aggregating $273,218.03. The Debtor in Possession believes only 139 of those Claimants, who hold Claims of $180,898.49, will ultimately hold allowed Claims. The remaining Unsecured Claims are held by 39 Claimants, but the Debtor in Possession believes only 24 of those Claimants will ultimately hold allowed Claims.

Estimated professional fees and expenses for legal services from January of 2011 through the Confirmation Date are $95,195.79, assuming the Confirmation Date occurs by the end of March 2011.[16] Estimated professional fees for accounting services through the Confirmation Date are $17,000.00[17] assuming the Confirmation Date occurs by the end of February 2011. The foregoing estimates shall not prevent the Court from awarding amounts in excess of the estimates. Post-Confirmation Date professional fees cannot be estimated meaningfully.

The Debtor in Possession or Reorganized Debtor may file a number of objections to Claims, motions to estimate contingent Claims, and motions for valuation of Collateral. The estimated liabilities listed above may not accurately reflect the Estate's liabilities, particularly if the anticipated objections and motions are not resolved as the Debtor in Possession now expects them to be. Nothing in this disclosure statement should be taken as an admission that a

---

[16] The estimate of professional fees is based upon average monthly attorneys' fees and expenses of $26,731.93 for counsel for the Debtor in Possession, plus $15,000.00 in estimated fees and expenses for counsel for the Unsecured Creditors' Committee.

[17] This amount is based upon the estimate provided by Doug Van Meter, CPA, of BKD, L.L.P., CPAs & Advisors. See Debtor's Application for Order Authorizing Employment and Compensation of Professionals in the Ordinary Course of Business, Combined with Brief in Support, filed December 7, 2010, Doc. No. 240.

Claimant is due anything or as an admission of the amount, type, or priority of any Claim, all of which shall remain subject to challenge notwithstanding anything stated herein.

While it appears a forced liquidation could result in an additional $1,000,000 or more in unsecured Claims, the Debtor in Possession believes that the fair market value of its assets on a going concern basis is such that none, if any, of its Secured Creditors are materially under-secured.    As a result, the Debtor in Possession does not believe Collateral valuation under Code § 506 is warranted and does not, as things now stand, intend to seek it.

## BALANCE SHEET, INCOME STATEMENT, AND *PRO FORMA* PROJECTIONS

The Debtor in Possession's balance sheet as of October 31, 2010, and income statement for the period January 1, 2010, through October 31, 2010, are collectively attached as Exhibit 1 to this disclosure statement.

Should Class 22 accept the Plan, the Debtor in Possession's projected income and expenses for November 2010 through December 2016 are collectively attached as Exhibit 2 to this disclosure statement.    The attached projections are based on historical data and the current status of operations and assume a three-percent inflation rate.

As shown by Exhibit 2, should Class 22 accept the Plan, the Debtor in Possession projects that the Reorganized Debtor would have an average of $420,424.34 available per month for debt service under the Plan and payments required under executory contracts and unexpired leases the Debtor in Possession proposes to assume, which would be sufficient to make the payments proposed under the Plan.    See Exhibit 3, which shows on a class-by-class basis the payments required under the Plan should Class 22 accept the Plan, and see Exhibit A to the Plan, which shows the monthly payments required under the Plan as proposed on executory contracts and

39

unexpired leases the Debtor in Possession proposes will be assumed.    Note that Exhibit 2 assumes the continued use of all equipment.    Should equipment be lost by maturity of "TRAC leases" or otherwise and not be replaced with comparable equipment, net cash flow would be reduced, but the Debtor in Possession does not believe maturity of the "TRAC leases" at the times proposed under the Plan and potential loss of the equipment at that time will render the Reorganized Debtor unable to make the Plan payments proposed.

Should Class 22 reject the Plan, it is anticipated that New Paul's post-Effective Date balance sheet would look substantially similar to the balance sheet attached hereto as Exhibit 1, except New Paul would not owe any of the Unsecured Claims reflected thereon.    Likewise, New Paul's projected income and expenses for November 2010 through December 2016 would be as projected in Exhibit 2 for the Reorganized Debtor.    Should Class 22 reject the Plan, the Reorganized Debtor's assets would consist of all unencumbered assets of the Estate, which are believed to be *de minimus*, and its liabilities would consist of all Priority Claims and all Unsecured Claims.

## MANAGEMENT

Should Class 22 accept the Plan, Troy Paul will serve as President of the Reorganized Debtor and sole member of its Board of Directors.    Exhibit 4 is a copy of Troy Paul's resume.

Initially, Troy Paul will be paid $131,250 annually for services to be rendered and will receive employee benefits such as employer-paid health insurance, EFS Fuel Card charging privileges, use of a company cellular telephone, and 401(k) plan contribution.

Troy Paul was an employee, officer, director, and Insider of the Debtor and Debtor in Possession, was its sole Interest Holder, and will be the Reorganized Debtor's sole Interest Holder after the Effective Date.

Should Class 22 accept the Plan, Ryan Dobbs will serve as Secretary/Treasurer of the Reorganized Debtor and a member of its Board.   Exhibit 5 to this disclosure statement is a copy of Mr. Dobbs' resume.   Initially, Mr. Dobbs will be paid $118,800.00 annually for services to be rendered and will receive employee benefits such as employer-paid health insurance, use of a company vehicle, EFS card privileges, use of a company cellular telephone, and 401(k) plan contributions.

Mr. Dobbs was employed by the Debtor as Business Development & Marketing Manager for approximately four years Pre-Petition and was employed by the Debtor in Possession throughout the Case, but otherwise had no direct or indirect relationships with the Debtor.

Should Class 22 accept the Plan, the Reorganized Debtor will not have other officers or directors as of the Effective Date, but may add officers and directors as deemed appropriate thereafter consistently with its Articles of Incorporation and Bylaws.

If Class 22 rejects the Plan, the Reorganized Debtor's management will be governed by its shareholders consistently with applicable state law.   New Paul will be managed by Troy Paul on the same terms and conditions under which he would have been employed by the Reorganized Debtor had Class 22 accepted the Plan.   Mr. Dobbs will also play a significant role in management of New Paul, also on the same terms and conditions under which he would have been employed by the Reorganized Debtor had Class 22 accepted the Plan.

## THE RELATIONSHIP OF THE DEBTOR WITH AFFILIATES

The Debtor in Possession does not have any Affiliates, except as disclosed elsewhere in

this Disclosure Statement or in the Plan.

## LITIGATION

The Debtor was a party to the following Pre-Petition lawsuits:

- *General Electric Capital Corporation, et al., v. Paul Transportation, Inc., et al.*, Case No. CV-2010-00049 (U.S. District Court, Western District of Oklahoma);

- *Toyota Motor Credit Corporation v. Paul Transportation, Inc.*, Case No. CJ-2010-19-03 (District Court of Garfield County, State of Oklahoma);

- *Daryl Thomason Trucking, Inc., et al., v. Caterpillar, Inc., et al.*, Case No. 10C0392-005, District Court of Bowie County, State of Texas); and

- *Coppermark Bank v. Paul Transportation, et al.*, Case No. CJ-2010-445 (District Court of Garfield County, State of Oklahoma);

- Multiple workers' compensation claims.

The GE and Toyota lawsuits are collection suits.   The GE suit included causes of action

against Troy Paul individually.   On February 11, 2011, Troy Paul entered into an agreed

judgment in favor of GE for $1,481,369.95, and an agreed judgment in favor of CPLC for

$249,413.73.   The *Daryl Thomason Trucking, Inc.,* case is a products-liability suit in which the

Debtor in Possession seeks to recover damages it sustained as a consequence of forty-five

defective C15 Caterpillar engines it purchased from Warren Power & Machinery, Inc., d/b/a

Warren CAT.   On May 8, 2010, the Debtor and two other plaintiffs filed the above-described

*Daryl Thomason Trucking, Inc.,* products-liability suit against Caterpillar, Inc., and the dealers.

In *Thomason*, the Debtor in Possession seeks to recover damages in the estimated amount of

$250,000 resulting from the costs of repairs to the engines, compensation for the time and lost

42

opportunities while the engines were out of service, and other damages.  Discovery is ongoing in the *Thomason* case, and a scheduling order has not been entered.

The *Coppermark Bank* lawsuit is a foreclosure case on the former residence of Troy Paul, and to call various letters of credit executed by the Debtor and secured by that realty.  The Debtor in Possession was identified as a defendant as it may have an interest in the real property through ownership of a shop building located thereon.  Coppermark Bank only seeks a judgment *in rem* against the Debtor in Possession in the foreclosure case.

All of the lawsuits to which the Debtor was a party defendant will be fully resolved by the Plan insofar as the Debtor in Possession is concerned.  The *Daryl Thomason Trucking, Inc.,* case will continue to be prosecuted by the Reorganized Debtor.

Except as otherwise indicated herein, no Post-Petition litigation involving the Debtor in Possession is now pending.  However, the lack of currently pending litigation shall not preclude the commencement of any litigation deemed appropriate.

As stated above, the Debtor in Possession or Reorganized Debtor may file a number of objections to proofs of Claim and motions to estimate contingent Claims.  Likewise, the Debtor in Possession or Reorganized Debtor may file a number of motions to value Collateral.

The Debtor in Possession has not decided whether pursuit of any Avoidance Actions that may exist would be cost effective.  Given the magnitude of the Priority Claims in this Case, it is not likely Unsecured Claimants would receive any recovery from successfully-prosecuted Avoidance Actions.  As a result, the Debtor in Possession, Reorganized Debtor, or Liquidating Trustee, as appropriate, may instead seek to invoke Code § 502(d) as to recipients of avoidable transfers, if any.

The Estate may also hold causes of action against various persons and entities. A detailed evaluation of the merits of these potential causes of action or estimate of their monetary worth has not been made. All causes of action, whether arising Pre-Petition or Post-Petition, and whether arising under state or federal law, are specifically preserved under the Plan and may be pursued after its Effective Date.

Pursuing any of the litigation described above would entail incurring attorneys' fees and expenses. At this point, it is not possible to give any meaningful estimate of what those fees and expenses might ultimately total. However, the fees and expenses in connection with the Claims reconciliation process might easily exceed $100,000.

## TAX CONSEQUENCES OF THE PLAN

The Debtor in Possession provides the following discussion of the federal income tax consequences of the Plan as general information. The Debtor in Possession has not obtained or requested a ruling from the Internal Revenue Service or an opinion of counsel with respect to any tax matters. This general discussion is not intended to present a detailed explanation of the federal income tax consequences of the Plan. Those consequences will depend, in substantial part, upon factual matters relating to each particular Claimant.

**THE DEBTOR IN POSSESSION URGES EACH CLAIMANT TO SEEK ADVICE FROM ITS OWN TAX ADVISOR ABOUT THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND, IF APPLICABLE, STATE AND LOCAL TAX CONSEQUENCES.**

## A.   Tax Consequences to the Estate

To the extent the Plan discharges Debt, the Estate may realize Debt-forgiveness income.

However, the Internal Revenue Code provides that if a taxpayer is under the jurisdiction of a

bankruptcy court in a case governed by Title 11 of the United States Code, and the discharge of

indebtedness arises pursuant to a plan of reorganization approved by a bankruptcy court, the

Estate will not be required to include Debt-forgiveness income in gross income.   If excluded

Debt-forgiveness income occurs, the Internal Revenue Code provides that amounts so excluded

may, under certain circumstances, reduce tax attributes of the taxpayer, including net operating

loss carryovers and the tax basis in property.

The Debtor was a Subchapter S corporation for income tax purposes.   As a pass-through

entity, the Debtor did not pay income taxes and did not have tax attributes.   However, under

26 U.S.C. § 108(d)(7), with a Subchapter S corporation such as the Debtor and as potentially

relevant here, 26 U.S.C. §§ 108(a) and (b) are applied at the corporate level.   And, for purposes of

§ 108(b)(2)(A), any loss or deduction that is disallowed to the Debtor's Interest Holder under

26 U.S.C. § 1366(d)(1) will be treated as a net operating loss of the Estate.   As a consequence, the

only attributes that a Subchapter S corporation generally has available for reduction under

26 U.S.C. §§108(b)(2) will be Interest Holder suspended losses and basis in corporate assets.

Under 26 U.S.C § 1017(b)(2), unless the Debtor elects under 26 U.S.C § 108(b)(5), asset-basis

reduction will not be available if the aggregate adjusted basis of corporate property does not

exceed corporate liabilities immediately after the discharge.

Should Class 22 reject the Plan, the issuance of equity securities to Claimants holding

Unsecured Claims will terminate the Debtor's Subchapter S status.

45

## B.  Tax Consequences to Claimants

The tax consequences of the Plan on Claimants will depend on many factors, including:
(i) the type of consideration received by the Claimant in exchange for its Claim; (ii) whether the
Claimant reports income on the accrual basis; and (iii) whether the Claimant receives
consideration in more than one tax year.   However, the Debtor in Possession does not expect
Claimants to experience any material, adverse tax consequences as result of the Plan, other than
those inherent in Claimants being paid.

## LIQUIDATION[18]

In a liquidation, fully-encumbered Collateral would probably be abandoned, and the
holders of Secured Claims would be allowed to foreclose their security interests.   Unexpired
leases would likely be rejected, and lessors would be allowed to obtain possession of the property
leased.   The Estate's unencumbered property, and any property viewed as having equity in it,
would be sold or otherwise reduced to cash, and the proceeds would be distributed according to
the hierarchy set forth in Code § 726.

Based on the values given in the "Available Assets and Their Value" section of this
disclosure statement and the estimated Secured Claims reflected in the "Claims Against the
Estate" section of this disclosure statement, a liquidation of all unencumbered Property of the
Estate and all Property of the Estate in which it appears there may be equity would result in gross
sales proceeds of $498,452.71, exclusive of any net recoveries that might be achieved on
avoidance and other actions.

After deducting $24,922.64 in estimated Chapter 7 trustee's fees of five percent (5%) as

---

[18]    This liquidation analysis was prepared by Kline, Kline, Elliott & Bryant, P.C, counsel for the
Debtor in Possession, and is based on the information stated.

set out under Code §326, and other administrative expenses, such as attorneys' fees, brokers' fees, and accountants' fees totaling $49,845.27, which is ten percent (10%) of the estimated sale proceeds and is based on prevailing rates, $423,684.80 would be available for payment to the holders of unpaid Chapter 11 administrative expense Claims and other Priority Claims, again exclusive of any net recoveries that might be achieved on avoidance and other actions. As set out under "The Debtor in Possession's Estimate of its Actual Liabilities" section of this disclosure statement, the Debtor in Possession estimates that those administrative expenses and other Priority Claims would exceed approximately $1,012,563.68 on any particular day, exclusive of any amounts that might be payable to RTS Financial, adequate protection and lease payments, which total $330,453.46 per month, professional fees, or amounts as to which there are deposits. As a result, absent success in prosecuting avoidance and other actions far beyond what the Debtor in Possession believes is likely, the Debtor in Possession does not believe that Claimants holding Unsecured Claims would receive anything in a Chapter 7 liquidation.

Under the Plan, if Class 22 accepts the Plan, the Reorganized Debtor will pay:  i) in full Priority Claims and Secured Claims, with most Claims being paid over time; ii) thirty-five cents on the dollar (.35) on Unsecured Claims of $10,000 or less or Unsecured Claims reduced to $10,000, with the payment occurring on or about the Plan Effective Date; and iii) $2,422,426.28 on Unsecured Claims of more than $10,000 (i.e., Class 22 Claims), payable without interest in graduated monthly payments over eight (8) years, plus a pro rata distribution from the Liquidating Trust of the net proceeds, if any, from the Liquidating Trustee's successful prosecution or settlement of any of the Designated Avoidance Actions, after payment of, and reserve for, the costs and expenses of the Liquidating Trust. The foregoing is intended only as a brief summary of the Plan; Parties in Interest should review the detailed provisions of the Plan, which shall control, for a more comprehensive statement of the treatment being proposed under the Plan.

The $2,422,426.28 amount payable to Class 22 by the Reorganized Debtor is seventy-five

percent (75%) of the Debtor in Possession's estimate of its actual liability on Class 22 Claims,

without consideration of any recovery from distributions by the Liquidating Trust. A Claimant's

percentage of recovery will be higher if the allowed Class 22 Claims are ultimately lower than the

Debtor in Possession's estimate, and will be lower if the allowed Class 22 Claims are ultimately

higher than the Debtor in Possession's estimate.

Should Class 22 accept the Plan, the Interest Holder will retain his Pre-Petition equity

security interest.

Should Class 22 reject the Plan, Claimants holding Priority Claims will be paid in full,

again generally over time, either by the Reorganized Debtor, which will be vested with all

unencumbered assets of the Estate, or by New Paul, which will be an Oklahoma limited liability

company formed and wholly-owned by Troy Paul and, generally, will be vested with all assets not

vested in the Reorganized Debtor.  New Paul will fully pay Secured Claims as provided in the

Plan, again over time, and perform under assumed and assigned executory contracts and unexpired

leases.  Should Class 22 reject the Plan, Claimants holding Unsecured Claims will receive a

pro-rata distribution of one hundred percent (100%) of the equity securities of the Reorganized

Debtor, and the Interest Holder's Pre-Petition equity security interest will be canceled, and he will

not receive or retain anything on account of his Pre-Petition equity security interest.  As owners of

the Reorganized Debtor, Claimants holding Unsecured Claims will effectively control the assets of

the Reorganized Debtor, subject to the terms of the Plan, which requires the Reorganized Debtor to

use its assets to first pay any unpaid Priority Claims, and then requires use of its remaining assets

to pay Claimants holding Unsecured Claims pro-rata.  The Debtor in Possession does not believe

it likely that Unsecured Creditors would receive any distributions should Class 22 reject the Plan. Please see the Plan for more detail.

## RISK FACTORS

The Reorganized Debtor proposes to pay most Claims over time.    As a result, Claimants will be subject to the risk that the Reorganized Debtor's business may not generate sufficient funds to make the payments proposed under the Plan, *i.e.*, the Reorganized Debtor's cash flow projections either overestimate income, underestimate expense, or some combination of the two.

Claimants will also be subject to the risk that the value of the Reorganized Debtor's assets may decline at a rate faster than Claims are reduced by payments under the Plan.    If that should occur, it could adversely affect recoveries.    The Debtor in Possession believes the payments proposed under the Plan will reduce Claims faster than the Reorganized Debtor's assets are likely to depreciate.

Additionally, as discussed earlier in this disclosure statement, multiple "TRAC lease" balloon payments will become payable to Paccar Financial Corp. over the year following Plan confirmation.    If arrangements cannot be made to restructure those balloon payments as they become due, and a liquidation of the "leased" equipment does not fully satisfy the Paccar Financial Corp. "TRAC lease" balloon payments, the Reorganized Debtor could face substantial, matured obligations to Paccar Financial Corp. that would jeopardize the Reorganized Debtor's ability to make the payments proposed under the Plan.

As also discussed earlier in this disclosure statement, loss of the use of the equipment "leased" under the Paccar Financial Corp. "TRAC leases" would adversely affect the Reorganized Debtor's cash flow and will make it more difficult for the Reorganized Debtor to

49

make the Plan payments proposed. For that matter, it is likely that loss of the use of any material equipment would have an adverse impact on cash flow and, thus, the Reorganized Debtor's ability to make the Plan payments proposed.

Finally, the equipment used by the Debtor is aging, and should be replaced over time and in the ordinary course of business. The burdens imposed on the Reorganized Debtor under the Plan may make replacement much more difficult, which could have an adverse impact on cash flow and, thus, the Reorganized Debtor's ability to make the Plan payments proposed.

Dated this 14th day of February, 2011.

PAUL TRANSPORTATION, INC.

By: _____
Troy Paul, President

/s/Stephen W. Elliott
Stephen W. Elliott, OBA #2685
Matthew C. Goodin, OBA #19327
KLINE, KLINE, ELLIOTT & BRYANT, P.C.
720 NE 63rd Street
Oklahoma City, OK 73105
(405) 848-4448
(405) 842-4539 (fax)
selliott@klinefirm.org

ATTORNEYS FOR DEBTOR IN POSSESSION,
PAUL TRANSPORTATION, INC.

50